HALLER, Acting P.J.
*212 This case raises issues concerning the legal obligations imposed on health care providers when a patient's health care directives conflict with the providers' opinions that the requested care would be medically ineffective and may cause harm. Elizabeth Alexander, a 70-year-old woman suffering from end-stage terminal pancreatic cancer, died four days after she was transferred from a skilled nursing facility to Scripps Memorial Hospital La Jolla (Scripps). Elizabeth had an advance health care directive stating she wanted all measures taken to prolong her life. Defendants *738 declined to provide Elizabeth with certain advanced life support measures on the basis that such measures would have been ineffective and caused her to suffer further harm.
After Elizabeth's death, her estate (Estate) and children, Clenton Alexander, Christopher Alexander, and Jacquelyn McDermet (together, Plaintiffs),[1] sued Scripps and numerous medical professionals, alleging Elizabeth died after defendants failed to provide the life-sustaining treatment and comfort care requested in her advance health care directive. The trial court resolved Plaintiffs' claims in favor of Defendants either by sustaining demurrers or granting summary judgment. For reasons we shall explain, we affirm except for an award of expert fees to one physician defendant against Christopher and McDermet. We also deny Plaintiffs' request for judicial notice.[2]
*213 OVERVIEW
Plaintiffs sued Scripps and nine medical professionals involved in Elizabeth's care and treatment. Four of the physician defendants were directly involved in Elizabeth's care: Dr. Donald Ritt (palliative care), Dr. Gustavo Lugo (hospitalist), Dr. Preeti Mehta (internal medicine), and Dr. Marie Shieh (oncologist). The remaining physician defendants were members of Scripps's Appropriate Care Committee, a team of volunteer physicians who provide recommendations as to whether certain treatment is appropriate for a patient (Appropriate Care Committee). The members of the Appropriate Care Committee were Dr. Shawn Evans (chief of staff at Scripps), Dr. Ayana Boyd-King, Dr. Ernest Pund, and Dr. Charles Ettari. As a treating physician, Dr. Lugo also participated in the Appropriate Care Committee for Elizabeth's case. Plaintiffs also sued Karen Knight, a nurse who helped facilitate Elizabeth's transfer to another facility based on Christopher's request.[3]
After Plaintiffs filed their initial complaint, the trial court sustained several demurrers, which led to Plaintiffs' operative fourth amended complaint. In the operative complaint, Plaintiffs asserted claims against Defendants for violations of five statutes within the Health Care Decisions Law ( Probate Code, § 4600 et seq. ),[4] elder abuse, professional negligence, wrongful death, negligent misrepresentation, and negligent infliction of emotional distress. Many of Plaintiffs' claims were based on allegations that Defendants did not provide Elizabeth with advanced life support measures such as cardiopulmonary resuscitation (CPR), and adequate pain medication, nutrition and fluids. The *739 parties engaged in extensive discovery over a three-year period.
Defendants moved for summary judgment on Plaintiffs' claims and supported their motions with expert declarations stating Defendants complied with the standard of care, did not violate the Probate Code, and did not cause Elizabeth injury or death. While these motions were pending, Plaintiffs sought to depose the Scripps Defendants and Dr. Ritt's expert, but the trial court denied that request. Thereafter, Plaintiffs opposed Defendants' summary judgment motions with declarations from their own expert, Dr. Laurence Boggeln. The trial court granted Defendants' summary judgment motions. These rulings were largely based on the court's decision to sustain Defendants' objections to Dr. Boggeln's opinions on the basis that the opinions were conclusory, lacked foundation, and the expert failed to consider critical facts, *214 including Elizabeth's end-stage terminal cancer. Further, the trial court found Defendants were immune from liability for alleged violations of the Health Care Decisions Law.
After the trial court granted Defendants summary judgment, the trial court awarded Defendants their costs, including expert fees under Code of Civil Procedure section 998. In total, the costs amounted to approximately $160,000.
On appeal, Plaintiffs contend the trial court erred in: (1) sustaining demurrers to their elder abuse claims; (2) refusing their request to depose a defense expert; (3) sustaining objections to their expert's declarations and overruling their objections to defense expert declarations; (4) finding Drs. Evans, Boyd-King, Ettari, and Pund (Appropriate Care Committee) did not owe Elizabeth a duty of care; (5) finding there was no triable issue of fact on their negligent misrepresentation claim; (6) finding Defendants were immune from liability and did not violate provisions of the Health Care Decisions Law; (7) denying their motion to reconsider the summary judgment rulings in favor of the Scripps Defendants and Dr. Ritt; (8) improperly awarding Defendants costs and expert fees; and (9) delaying depositions until the complaint was amended to name all of Elizabeth's known heirs.
We conclude the trial court properly sustained Defendants' demurrers to Plaintiffs' causes of action for elder abuse because Plaintiffs did not allege Defendants' conduct was sufficiently egregious to constitute elder abuse within meaning of the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act) ( Welf. & Inst. Code, § 15600 et seq. ), and Plaintiffs did not meet the pleading requirements for their elder abuse claims. Plaintiffs' allegations, at best, stated a claim for professional negligence.
We also conclude the trial court properly granted Defendants summary judgment. On Plaintiffs' professional negligence and wrongful death claims, they could not defeat summary judgment because their expert did not set forth sufficient reasoning or explanation for his opinion that Defendants' breaches of the standard of care and violations of the Probate Code caused Elizabeth injury or death. Plaintiffs' negligent misrepresentation claims failed because the statements they relied upon were not positive assertions by Defendants, and Plaintiffs did not justifiably rely on Defendants' statements.
Concerning Plaintiffs' causes of action for Probate Code violations, we find Defendants were immune from liability under section 4740 for alleged violations of sections 4730 concerning communication of health care decisions; 4732 concerning recordation of information about a patient's capacity; 4736 concerning a health care provider's or institution's duties upon *215 declining to comply with a patient's health *740 care instructions; and 4742, subdivision (b) concerning liability for concealing or coercing or fraudulently inducing an individual to change an advance health care directive. On Plaintiffs' remaining Probate Code argument, contending the Scripps Defendants and Dr. Ritt violated section 4731, subdivision (a) by not requesting and maintaining Elizabeth's advance health care directive, we conclude section 4731 does not apply to the Scripps Defendants because they were not supervising health care providers within the meaning of the Health Care Decisions Law and, as to Dr. Ritt, Plaintiffs did not raise a triable issue of fact concerning whether Dr. Ritt intentionally violated the statute.
Lastly, we conclude the trial court erred in holding Christopher and McDermet responsible for Dr. Ritt's expert fees under Code of Civil Procedure section 998 because Dr. Ritt did not serve them with offers to compromise. Accordingly, we reverse the judgment in favor of Dr. Ritt to the extent it awards those fees. In all other respects, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
Elizabeth's Hospitalization
In June 2012, a doctor informed Elizabeth she had stage four pancreatic cancer and there was no cure. Elizabeth's options included palliative chemotherapy, supportive care, or hospice. She stated she wanted to continue fighting and elected to undergo palliative chemotherapy. Elizabeth's cancer was very aggressive and had spread to her liver and bones.
In January 2013, Elizabeth was admitted to Emeritus Skilled Nursing Facility (Emeritus) because she could no longer care for herself. Elizabeth had an advance health care directive in which she elected to have all measures taken to prolong her life. Elizabeth designated Christopher as the person who could make health care decisions for her in the event she was unable to make those decisions. Christopher completed a Physician Orders for Life Sustaining Treatment (POLST) form, indicating he wanted Elizabeth to be "full code," meaning she would receive CPR and full medical treatment.
On February 15, 2013, Elizabeth went to the emergency room at Scripps for placement of a feeding tube because she was malnourished. She was awake and alert, but was weak and had difficulty speaking. After a physician placed the feeding tube, Elizabeth returned to Emeritus.
On February 17, 2013, Dr. Aboo Nasar, the medical director of Emeritus, evaluated Elizabeth because her health had significantly deteriorated since she was first admitted to the facility. Elizabeth could not communicate with *216 Dr. Nasar and was malnourished and weak. Dr. Nasar described Elizabeth as "quite terminal" and expected her to die within days. Dr. Nasar discussed Elizabeth's condition with Christopher, who stated he wanted everything done to prolong Elizabeth's life. Dr. Nasar believed treating Elizabeth as "full code" would cause her additional pain and suffering.
On February 18, 2013, Dr. Nasar discharged Elizabeth to Scripps for evaluation. He did not expect her to return to Emeritus as he believed her death was imminent. A licensed vocational nurse filled out a nursing home discharge form for Elizabeth, indicating (apparently in error) Elizabeth did not "have a condition or chronic disease that may result in a life expectancy of less than 6 months." That designation required physician documentation, but there was no evidence that a physician agreed with the nurse's determination of Elizabeth's prognosis.
Elizabeth presented to the emergency room at Scripps via ambulance. Dr. Christopher Wiesner saw Elizabeth in the emergency *741 room and noted she was alert, but minimally verbally responsive. Christopher informed Dr. Wiesner that Elizabeth wished to have all medical care, including full resuscitation and a feeding tube. Scripps had a copy of Elizabeth's POLST. Additionally, Christopher informed Dr. Wiesner that Elizabeth had an advance health care directive. In the emergency room, Elizabeth received hydromorphone for pain and saline.
Dr. Wiesner admitted Elizabeth to the hospital for consultation with oncology or palliative care. A nurse noted in Elizabeth's medical record that Elizabeth had an advance health care directive and that a copy of it was in her chart.
Dr. Lugo, the hospitalist, saw Elizabeth when she was admitted to Scripps on February 18, 2013. He noted she looked near terminal and emaciated with severe and obvious signs of malnutrition. Dr. Lugo's treatment plan stated comfort measures were the primary goal to ease Elizabeth's suffering. Although Dr. Lugo determined tube feedings would be futile and would prolong Elizabeth's suffering, he ordered this care be provided.
Dr. Shieh, a consulting oncologist, evaluated Elizabeth on February 18, 2013. Dr. Shieh noted Elizabeth was "post palliative chemotherapy and radiation. She has now had a progressive decline in her functional status, and there [was] evidence of moderate progression of disease." Dr. Shieh spoke with Christopher, who informed her Elizabeth was a fighter and would want to continue any possible available therapies. Dr. Shieh informed Christopher that "given [Elizabeth's] poor performance status, and her liver failure, ... there really [were] no other safe therapies at [that] time."
*217 Dr. Ritt, a member of the palliative care team, also evaluated Elizabeth on February 18, 2013. Dr. Ritt noted Elizabeth was "clearly an individual who should not undergo aggressive resuscitation[;] cardiac compression, and/or intubation would not be appropriate. She is frail, debilitated, and has some metastasis that is extensive." Dr. Ritt prepared orders for tube feedings and pain medications. He also entered a do not resuscitate (DNR) order, but did not tell Christopher of his action. However, according to Dr. Ritt, he had a conversation with Christopher on February 18, 2013, that relayed the substance of the DNR order. Specifically, Dr. Ritt explained that maintaining Elizabeth at full code status, including providing CPR and other similar measures, would cause her to suffer additional harm and any care that would cause further harm and suffering could not be performed.
Dr. Ritt spoke with McDermet about a conversation he had with Christopher about Elizabeth's code status. During the conversation with McDermet, Dr. Ritt informed her that he did not agree with the family's desire to engage in life-prolonging measures because Elizabeth was terminally ill.
Dr. Ritt contacted Dr. Evans, chief of staff at Scripps, and initiated steps to involve Scripps's Appropriate Care Committee, comprised of Drs. Evans, Pund, Ettari, Boyd-King and Lugo, the treating physician, in Elizabeth's case.
On February 19, 2013, Elizabeth received a fentanyl patch for her pain. She was also cleared for transfer back to Emeritus as soon as possible with her feeding tube in place. However, later that day, Dr. Ritt placed a hold on Elizabeth's transfer based on information from nurse Knight that Emeritus would not accept the patient back at that time. Emeritus would not accept Elizabeth's transfer if her family wanted her to have a full resuscitation or full code order in place. Christopher was not aware Dr. Ritt had placed a hold on Elizabeth's transfer.
*742 The Appropriate Care Committee met on February 20, 2013, to discuss the incongruence between Elizabeth's family's wishes for her to be "full code" status and the recommendations of treating doctors that such treatment would be medically ineffective and may cause harm. The Appropriate Care Committee reviewed Elizabeth's medical records, including opinions from Drs. Wiesner, Shieh, Ritt, and Lugo that Elizabeth should not undergo advanced life support measures and CPR because those efforts would be futile. The committee noted Elizabeth's condition had deteriorated while in the hospital. The committee concluded that appropriate care included preserving Elizabeth's mental and physical comfort, such as providing oxygen, IV fluids, pain medications, and palliative care. Additionally, the Appropriate Care Committee was aware of Elizabeth's family's preference to continue tube feeding and did not object to it because it was not necessarily harmful to her. The Appropriate Care Committee *218 recommended against advanced life support measures (i.e., CPR, intubation, and defibrillation ) because those measures would have been ineffective.
Members of the Appropriate Care Committee spoke with Christopher about Elizabeth's condition and their recommendations for appropriate care. Christopher expressed he understood Elizabeth's death was imminent and she had no opportunity for survival. However, Christopher maintained Elizabeth's advance health care directive should be followed and he was not willing to endorse anything to the contrary. The Appropriate Care Committee members explained that doctors could not embark on ineffective care. Christopher requested Elizabeth be transferred to another facility. Thus, the committee informed Christopher it would make efforts to transfer Elizabeth, provided the transfer did not harm her.
Thereafter, Knight contacted Christopher to facilitate Elizabeth's transfer. Christopher reiterated he did not agree with Elizabeth's DNR code status. Knight recommended Christopher contact Elizabeth's insurance to identify a covered facility and doctor who would accept her transfer.
On February 20, 2013, Dr. Lugo prescribed Elizabeth 1.5 milligrams of hydromorphone every two hours, as needed for pain. Later that day, Dr. Ritt increased Elizabeth's hydromorphone to two milligrams every two hours, as needed for pain, and prescribed lorazepam to ease her discomfort during the dying process. Dr. Ritt did not discuss the administration of lorazepam with Christopher.
Dr. Mehta (internal medicine) also saw Elizabeth on February 20, 2013. Dr. Mehta did not provide Elizabeth with intravenous fluids that day because Elizabeth was edematous, meaning she had an accumulation of excess fluid in cells, tissues, or body cavities. Further, Dr. Mehta decreased Elizabeth's tube feedings because she determined further nutrition was unnecessary and could be causing Elizabeth additional pain. Dr. Mehta discussed this change with Elizabeth's family. Christopher reiterated he wanted Elizabeth to be a full code patient.
Dr. Mehta reduced Elizabeth's hydromorphone to one milligram every two hours, as needed for pain. Elizabeth received two milligrams of hydromorphone at 2:02 p.m. and then one milligram at 11:47 p.m. She did not receive additional hydromorphone between that time, but did have a continuous release fentanyl patch for pain. Dr. Mehta observed Elizabeth in pain at 4:00 p.m. that day. The plan was for Elizabeth to be discharged to Emeritus the following morning, if possible.
Dr. Ritt saw Elizabeth on February 21, 2013. Elizabeth did not receive artificial *743 nutrition that day. Knight was able to arrange Elizabeth's transfer *219 back to Emeritus at 4:00 p.m. on February 21, 2013. Elizabeth died an hour and a half before her scheduled transfer. Consistent with the Appropriate Care Committee's recommendation and the DNR order in place, CPR was not initiated on Elizabeth. Dr. Mehta prepared a death report on Elizabeth and listed the causes of death as cardiorespiratory arrest related to progressive pancreatic cancer with metastasis to the liver, cancer cachexia, anemia, and severe malnutrition.
The Lawsuit
In May 2014, Clenton, on behalf of himself and the Estate, filed an action against Defendants, alleging 16 causes of action. In August 2015, after multiple rounds of demurrers, Plaintiffs filed their operative fourth amended complaint, alleging violations of the Probate Code, elder abuse, professional negligence, wrongful death, negligent misrepresentation, and negligent infliction of emotional distress.
Between March 2013 and March 2016, the parties engaged in discovery. During that time, Plaintiffs deposed 10 medical professionals and individuals designated as persons most knowledgeable for Scripps. Defendants produced documents, including medical records and billing records.
In March 2016, the Scripps Defendants and Dr. Ritt moved for summary judgment or, in the alternative, summary adjudication. They argued Plaintiffs could not prove the essential elements of negligence, including causation; there was no evidence the Scripps Defendants and Dr. Ritt violated the Probate Code; the Scripps Defendants and Dr. Ritt were immune from liability under the Probate Code; and Plaintiffs could not establish negligent misrepresentation and negligent infliction of emotional distress. The Scripps Defendants also argued the Appropriate Care Committee members did not owe Elizabeth a duty of care. The Scripps Defendants and Dr. Ritt supported their motions with an expert declaration from Dr. Eric Roeland regarding whether they complied with the standard of care and contributed to Elizabeth's death or caused her injury.
In April 2016, Drs. Lugo, Mehta, and Shieh moved for summary judgment or, in the alternative, summary adjudication. They made arguments similar to those asserted by the Scripps Defendants and Dr. Ritt, and each defendant supported his or her motion with an expert declaration consistent with the opinions Dr. Roeland offered.
In May 2016, Plaintiffs opposed the Scripps Defendants' and Dr. Ritt's summary judgment or summary adjudication motions. Plaintiffs supported their opposition with a May 2016 expert declaration from Dr. Boggeln, who *220 opined the care and treatment Defendants provided to Elizabeth failed to comply with the standard of care and Probate Code, and was a substantial factor in causing Elizabeth injury and death. The Scripps Defendants and Dr. Ritt objected to Dr. Boggeln's declaration on numerous grounds, including that Dr. Boggeln's opinions were conclusory and lacked factual support.
In June 2016, the trial court heard arguments on the Scripps Defendants' and Dr. Ritt's summary judgment or summary adjudication motions and their objections to Dr. Boggeln's declaration. During the hearing, the court questioned Dr. Boggeln's opinions because he provided little explanation for his conclusions and relied on a prognosis determination from a nurse at Emeritus that was not supported with physician documentation. Plaintiffs offered, "[t]o the extent that the Court still has concerns regarding [Dr. Boggeln's] declaration, we're happy to submit an amended declaration to address the Court's concerns."
*744 The trial court did not request a supplemental declaration, and Plaintiffs did not request a continuance.
The trial court granted the Scripps Defendants' and Dr. Ritt's summary judgment motions and sustained their objections to all of the opinions in Dr. Boggeln's declaration. The court concluded there was no triable issue of fact on whether the Scripps Defendants and Dr. Ritt violated the standard of care and caused Elizabeth injury or death; the Appropriate Care Committee members did not owe Elizabeth a duty of care; the Scripps Defendants and Dr. Ritt were immune from liability for alleged statutory violations of the Probate Code; and there was no competent evidence to support Plaintiffs' other claims.
After the trial court granted the Scripps Defendants' and Dr. Ritt's summary judgment motions, Plaintiffs opposed Drs. Lugo, Mehta, and Shieh's summary judgment or summary adjudication motions and filed amended declarations from Dr. Boggeln in support of their oppositions. Dr. Boggeln reached the same opinions as he had in his earlier declaration. Drs. Lugo, Mehta, and Shieh objected to Dr. Boggeln's amended declarations.
In July 2016, the trial court granted Drs. Lugo, Mehta, and Shieh's summary judgment motions and sustained their objections to Dr. Boggeln's declarations. The trial court granted Drs. Lugo, Mehta, and Shieh's summary judgment motions on the same grounds as it had for the Scripps Defendants and Dr. Ritt.
The trial court entered judgments in favor of Defendants. After Plaintiffs' motions to tax costs, the trial court awarded Defendants costs, totaling $160,895.92. Specifically, the court awarded $43,302.51 to the Scripps Defendants, $28,237 to Dr. Lugo, $32,501.22 to Dr. Mehta, $28,801.71 to Dr. Ritt, and $28,053.48 to Dr. Shieh.
*221 DISCUSSION
I. Demurrer Rulings
A. Background
After the trial court sustained in part and overruled in part Defendants' demurrer to Plaintiffs' second amended complaint, Plaintiffs filed a third amended complaint, alleging 12 causes of action against each Defendant. As relevant here, the trial court sustained without leave to amend Defendants' demurrer to Plaintiffs' cause of action for elder abuse based on neglect, and sustained with leave to amend the demurrer to a cause of action for elder abuse based on financial abuse.
In August 2015, Plaintiffs filed the operative fourth amended complaint that included a cause of action for financial elder abuse. The trial court sustained Defendants' demurrer to the elder abuse cause of action without leave to amend and granted their associated motion to strike enhanced penalties and punitive damages.
B. Standard of Review
We review an order sustaining a demurrer de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law. ( Moore v. Regents of University of California (1990) 51 Cal.3d 120, 125, 271 Cal.Rptr. 146, 793 P.2d 479.) It "is error for a trial court to sustain a demurrer [if] the plaintiff has stated a cause of action under any possible legal theory." ( Aubry v. Tri-City Hospital Dist . (1992) 2 Cal.4th 962, 967, 9 Cal.Rptr.2d 92, 831 P.2d 317.) In determining whether the pleading states a viable cause of action, we deem the factual allegations to be true, but disregard contentions, deductions, and legal conclusions. ( Hill v. Roll Internat. Corp . (2011) 195 Cal.App.4th 1295, 1300, 128 Cal.Rptr.3d 109.)
*745 If "a demurrer is sustained without leave to amend, [we] must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, [we] will conclude that the trial court abused its discretion by denying the plaintiff leave to amend. [Citation.] The plaintiff bears the burden of establishing that it could have amended the complaint to cure the defect." ( Berg & Berg Enterprises, LLC v. Boyle (2009) 178 Cal.App.4th 1020, 1035, 100 Cal.Rptr.3d 875.)
C. Elder Abuse Based on Neglect and Physical Abuse
In their third amended complaint, Plaintiffs alleged Defendants committed elder abuse by neglecting and physically abusing Elizabeth. Plaintiffs contend *222 the trial court erred in sustaining Defendants' demurrers to the elder abuse claim. Specifically, Plaintiffs argue the trial court ignored and disregarded allegations in their third amended complaint that Defendants " 'recklessly failed to provide medical care for [Elizabeth's] physical and mental health needs' "; " 'recklessly failed to protect [Elizabeth] from health and safety hazards' "; " 'recklessly abandoned [Elizabeth] by recklessly deserting and willfully forsaking [Elizabeth] while they had care and custody of [her] under circumstances in which a reasonable person would continue to provide care and custody' "; and "recklessly 'held [Elizabeth's] transfer to a facility that would provide life-sustaining treatment, administered drugs to hasten [Elizabeth's] demise without her or her representative's consent, provided [Elizabeth] with less than 3 tablespoons of IV fluids per day for two days and even less on the third day, withheld from [Elizabeth] any feeding tube nutrition for a day, and failed to provide [Elizabeth] pain medications for more than 10 hours.' " Plaintiffs argue these allegations sufficiently pleaded a claim for elder abuse based on neglect and physical abuse under the Elder Abuse Act. We disagree.
1. Legal Principles
"The Elder Abuse Act makes certain enhanced remedies available to a plaintiff who proves abuse of an elder, i.e., a 'person residing in this state, 65 years of age or older.' " ( Carter v. Prime Healthcare Paradise Valley LLC (2011) 198 Cal.App.4th 396, 404, 129 Cal.Rptr.3d 895 ( Carter ).) "The Elder Abuse Act's heightened remedies are available only in limited circumstances. A plaintiff must prove, by clear and convincing evidence, that a defendant is liable for either physical abuse ... or neglect ..., and that the defendant committed the abuse with 'recklessness, oppression, fraud, or malice.' " ( Winn v. Pioneer Medical Group, Inc. (2016) 63 Cal.4th 148, 156, 202 Cal.Rptr.3d 447, 370 P.3d 1011 ( Winn ).) The heightened remedies available under the Elder Abuse Act include not only recovery of attorney fees and costs, "but also exemption from the damages limitations otherwise imposed by Code of Civil Procedure section 377.34. Unlike other actions brought by a decedent's personal representative or successor in interest, claims under the Act allow for the recovery of damages for predeath pain, suffering, and disfigurement." ( Id. at p. 155, 202 Cal.Rptr.3d 447, 370 P.3d 1011.)
Abuse under the Elder Abuse Act includes physical abuse, neglect, and "[t]he deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering." ( Welf. & Inst. Code, § 15610.07.) Neglect is "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Id., § 15610.57, subd. (a)(1).) Neglect includes "[f]ailure to provide medical *746 care for physical and mental health needs." (Id., § 15610.57, subd. (b)(2).) *223 " '[N]eglect' within the meaning of Welfare and Institutions Code section 15610.57 covers an area of misconduct distinct from 'professional negligence.' As used in the [Elder Abuse] Act, neglect refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.] Thus, the statutory definition of 'neglect' speaks not of the undertaking of medical services, but of the failure to provide medical care." ( Covenant Care, Inc. v. Superior Court (2004) 32 Cal.4th 771, 783, 11 Cal.Rptr.3d 222, 86 P.3d 290 ( Covenant Care ).) The Elder Abuse Act does not "apply whenever a doctor treats any elderly patient. Reading the act in such a manner would radically transform medical malpractice liability relative to the existing scheme." ( Winn, supra , 63 Cal.4th at p. 163, 202 Cal.Rptr.3d 447, 370 P.3d 1011.) "[T]he facts constituting the neglect and establishing the causal link between the neglect and the injury 'must be pleaded with particularity,' in accordance with the pleading rules governing statutory claims." ( Carter, supra , 198 Cal.App.4th at p. 407, 129 Cal.Rptr.3d 895.)
2. Plaintiffs' Allegations Were Insufficient to State a Claim for Elder Abuse Based on Neglect and Physical Abuse
Reviewing Plaintiffs' third amended complaint in light of the foregoing legal principles, we conclude Plaintiffs did not allege Defendants did anything sufficiently egregious to constitute neglect or physical abuse within the meaning of the Elder Abuse Act. As we shall explain, although Plaintiffs alleged Defendants failed to facilitate Elizabeth's transfer to another facility and withheld pain medication, nutrition, and fluids, the third amended complaint is replete with references to the extensive medical care Elizabeth received during her four-day hospitalization. Taken as a whole, Plaintiffs' allegations are insufficient to state a cause of action for elder abuse within the meaning of the Elder Abuse Act. Unlike cases in which elder abuse is properly pleaded because the patient was abandoned or ignored for extended periods of time, here family members disagreed with the nature of care their mother was receiving. Disagreements between physicians and the patient or surrogate about the type of care being provided does not give rise to an elder abuse cause of action.
We begin by analyzing Plaintiffs' specific allegations. First, Plaintiffs generally asserted Defendants recklessly failed to provide Elizabeth medical care, recklessly failed to protect her from health and safety hazards, and recklessly abandoned her. Plaintiffs' general statements of recklessness are not sufficient to survive a demurrer to their elder abuse cause of action. (See Carter, supra , 198 Cal.App.4th at p. 410, 129 Cal.Rptr.3d 895 [to avoid the sustaining of a demurrer for an elder abuse cause of action, a plaintiff must plead facts that show the conduct was reckless, not simply assert that it was reckless].)
*224 Next, Plaintiffs relied on an allegation that Defendants recklessly withheld Elizabeth's transfer to another facility. Reviewing the allegations in the third amended complaint in their totality, Plaintiffs did not plead facts amounting to neglect or physical abuse regarding the transfer. Plaintiffs alleged that on February 19, 2013, physician's orders referenced Elizabeth was to be transferred to Emeritus, but Dr. Ritt put a hold on the transfer. The complaint states that the next day, the Appropriate Care Committee noted Dr. Lugo would advise Dr. Mehta of Elizabeth's *747 imminent transfer. Further, the complaint alleges that later that same day, a Scripps administrator met with Christopher regarding Elizabeth's transfer, and Christopher's and the Scripps administrator's efforts to secure a transfer for Elizabeth to Emeritus were successful. These allegations do not assert Defendants egregiously withheld medical care or did anything else sufficiently egregious to constitute elder abuse because of the manner in which they handled Elizabeth's transfer. ( Covenant Care, supra , 32 Cal.4th at p. 786, 11 Cal.Rptr.3d 222, 86 P.3d 290 [elder abuse includes "egregious withholding of medical care"].) To the contrary, Plaintiffs' allegations show Scripps was working on the transfer with Christopher.
Lastly, Plaintiffs relied on allegations that Defendants administered drugs to Elizabeth to hasten her death and withheld nutrition, hydration, and pain medication. However, the third amended complaint is replete with allegations that Elizabeth regularly received pain medication, nutrition, and fluids. The allegations suggest Defendants provided Elizabeth with medical care throughout her hospitalization. (Compare Carter, supra , 198 Cal.App.4th at p. 408, 129 Cal.Rptr.3d 895 [finding that where defendants provided patient with medical care, plaintiff's allegations that defendants failed to infuse proper antibiotics and failed to locate proper size endotracheal tube were not sufficient to allege abuse or neglect under the Elder Abuse Act] with Mack v. Soung (2000) 80 Cal.App.4th 966, 95 Cal.Rptr.2d 830 [plaintiffs adequately stated a cause of action for elder abuse where doctor concealed the existence of patient's medical condition, opposed her hospitalization, and abandoned the patient in her dying hour of need by giving notice of withdrawal as her physician].)
Although Plaintiffs may disagree with the frequency and quantity of the medication, hydration, and nutrition Defendants provided to Elizabeth, Plaintiffs' allegations do not constitute abuse or neglect within the meaning of the Elder Abuse Act. At most, Plaintiffs' allegations might constitute professional negligence. ( Carter, supra , 198 Cal.App.4th at p. 408, 129 Cal.Rptr.3d 895 [citing cases stating elder abuse is distinct from professional negligence].)
D.-E.**
*225 II.-III.**
IV. Trial Court's Evidentiary Rulings on Declarations Submitted in Support of and Opposition to Summary Judgment Motions
Plaintiffs argue the trial court erred in overruling Plaintiffs' objections to defense expert declarations and sustaining Defendants' objections to Dr. Boggeln's opinions. The trial court's evidentiary determinations were critical to its summary judgment rulings in favor of Defendants on Plaintiffs' theories of negligence, wrongful death, and causes of action for statutory violations of the Probate Code. Thus, we consider Plaintiffs' arguments concerning the trial court's evidentiary rulings before addressing the trial court's orders granting summary judgment.
A. Legal Principles
"The declarations in support of a motion for summary judgment should be strictly construed, while the opposing declarations should be liberally construed. [Citation.] This does not mean that courts may relax the rules of evidence in determining the admissibility of an opposing declaration. Only admissible evidence is liberally construed in deciding whether there is a triable issue." ( *748 Bozzi v. Nordstrom, Inc . (2010) 186 Cal.App.4th 755, 761, 111 Cal.Rptr.3d 910 ( Bozzi ).) The trial court acts as a gatekeeper whose role is to "exclude 'clearly invalid and unreliable' expert opinion." ( Sargon Enterprises, Inc. v. Univ. of Southern Cal. (2012) 55 Cal.4th 747, 772, 149 Cal.Rptr.3d 614, 288 P.3d 1237 ( Sargon ).)
"[T]he gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' " ( Sargon, supra , 55 Cal.4th at p. 772, 149 Cal.Rptr.3d 614, 288 P.3d 1237.) "The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed." ( Pacific Gas & Electric, Co. v. Zuckerman (1987) 189 Cal.App.3d 1113, 1135, 234 Cal.Rptr. 630.) An "expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. [Citation.] Moreover, an expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." ( Bushling v. Fremont Medical Center (2004) 117 Cal.App.4th 493, 510, 11 Cal.Rptr.3d 653 ( Bushling ).)
*226 Although in Reid v. Google, Inc . (2010) 50 Cal.4th 512, 535, 113 Cal.Rptr.3d 327, 235 P.3d 988, the California Supreme Court expressly declined to reach the issue of the appropriate standard of review for reviewing a trial court's rulings on evidentiary objections made in connection with a summary judgment motion, the weight of authority, both before and after Reid , holds that an appellate court applies an abuse of discretion standard under these circumstances. (See, e.g., Serri v. Santa Clara University (2014) 226 Cal.App.4th 830, 852, 172 Cal.Rptr.3d 732 ; Ahn v. Kumho Tire U.S.A., Inc . (2014) 223 Cal.App.4th 133, 143-144, 166 Cal.Rptr.3d 852 ; Kincaid v. Kincaid (2011) 197 Cal.App.4th 75, 82-83, 127 Cal.Rptr.3d 863 ; Carnes v. Superior Court (2005) 126 Cal.App.4th 688, 694, 23 Cal.Rptr.3d 915.) De novo review is proper where evidentiary objections raise questions of law, such as whether or not a statement is hearsay. ( Pipitone v. Williams (2016) 244 Cal.App.4th 1437, 1451, 198 Cal.Rptr.3d 900 ; see also Sargon, supra, 55 Cal.4th at p. 773, 149 Cal.Rptr.3d 614, 288 P.3d 1237.) In contrast, evidentiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court. These are the types of evidentiary objections at issue in this case and, thus, we apply an abuse of discretion standard of review. "[T]he appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." ( In re Marriage of Connolly (1979) 23 Cal.3d 590, 598, 153 Cal.Rptr. 423, 591 P.2d 911.)
B. Plaintiffs' Expert Declarations
Plaintiffs offered multiple expert declarations from Dr. Boggeln to support their oppositions to Defendants' summary judgment motions. Plaintiffs argue the trial court abused its discretion in sustaining objections to Dr. Boggeln's opinions. As we shall explain, we conclude the trial court properly sustained most of Defendants' objections to Dr. Boggeln's opinions, but abused its discretion in sustaining some of the objections relevant to a cause of action premised on violations of the Probate Code.
In May 2016, Dr. Boggeln submitted a declaration in opposition to the Scripps Defendants' and Dr. Ritt's summary judgment motions. In that declaration, Dr. Boggeln set forth his background and stated *749 he had "reviewed the pertinent medical records regarding Elizabeth ... from Scripps ... and Emeritus." Dr. Boggeln proceeded to set forth a lengthy medical chronology of events based on Elizabeth's medical records.
After detailing the medical chronology, Dr. Boggeln expressed his opinions regarding the care and treatment Elizabeth received from Defendants. Dr. Boggeln opined "to a reasonable degree of medical probability" that Defendants, or some of them, failed to comply with the standard of care and *227 violated the Probate Code by: (1) failing to receive informed consent regarding changes in treatment, (2) failing to seek out and maintain Elizabeth's advance health care directive, (3) failing to note Elizabeth's capacity, (4) recommending Elizabeth not undergo advanced life support measures, (5) having inconsistencies between medical and billing records, (6) performing various tests on Elizabeth if they were not medically necessary, (7) performing a venipuncture on a patient with central venous and peripheral catheters, (8) preparing a draft POLST when the patient's wishes were recorded in writing, (9) failing to provide pain medication for 10 hours, and (10) refusing to provide life-sustaining treatment, including CPR, artificial nutrition, and hydration, requested by the patient and her family. Dr. Boggeln concluded Defendants' "standard of care and Probate Code violations were a substantial factor in injuring, and causing or contributing to [Elizabeth's] death."
The Scripps Defendants and Dr. Ritt objected to Dr. Boggeln's May 2016 declaration, arguing it lacked foundation, was conclusory, lacked in reason and fact, contained improper legal conclusions, and failed to address issues raised by their experts. The Scripps Defendants and Dr. Ritt also criticized Dr. Boggeln's declaration because he had not reviewed any transcripts from depositions completed in the case and did not acknowledge Elizabeth's dire condition and end-stage cancer.
The trial court sustained the Scripps Defendants' and Dr. Ritt's objections to Dr. Boggeln's declaration. The court found Dr. Boggeln provided little or no explanation for his conclusions, conducted only a limited review of "pertinent" medical records from Scripps and Emeritus, and omitted any mention of Elizabeth's end-stage terminal cancer.
On June 10, 2016, Plaintiffs submitted amended declarations from Dr. Boggeln in support of their oppositions to Dr. Lugo's, Dr. Mehta's, and Dr. Shieh's summary judgment motions. On June 17, 2017, Plaintiffs submitted a second amended declaration from Dr. Boggeln in opposition to Dr. Mehta's and Dr. Shieh's summary judgment motions. In his amended and second amended declarations, Dr. Boggeln expressed substantially the same opinions as in his original declaration. However, Dr. Boggeln acknowledged Elizabeth's cancer diagnosis and stated that cancer patients are not barred *228 from receiving CPR. He opined that the life-sustaining treatment Elizabeth had requested in her advance health care directive would have sustained and improved her life. Dr. Boggeln also addressed defense expert opinions that Elizabeth could not tolerate artificial hydration beyond the amounts provided. He implied she could have received further hydration and Defendants' failures to provide her with fluids and tube feedings led to her death because they resulted in dehydration and malnutrition.
Drs. Lugo, Mehta, and Shieh objected to Dr. Boggeln's amended declarations, arguing they lacked foundation, were conclusory, contained improper legal conclusions, and overlooked key facts, such as Dr. Nasar's opinion that Elizabeth would die within a matter of days after her transfer to Scripps. The trial court sustained Dr. *750 Lugo's, Dr. Mehta's, and Dr. Shieh's evidentiary objections, finding Dr. Boggeln had not reviewed any deposition transcripts in the case and offered no analysis of how Elizabeth's advanced stage terminal cancer impacted his conclusory opinions that Drs. Lugo, Mehta, and Shieh had violated the standard of care and caused Elizabeth's death. The trial court also found Dr. Boggeln provided little explanation or reasoning for his conclusions.
1. Opinions on Causation
We begin our analysis with the fatal flaw in Dr. Boggeln's declarations, namely his failures to adequately address causation. Even applying a liberal construction to Dr. Boggeln's declarations, he did not attempt to explain how any of Defendants' alleged breaches of the standard of care and failures to comply with the Probate Code caused Elizabeth injury or death or how requested measures would have, in Dr. Boggeln's words, "improved the quality of her life." Not only did he fail to acknowledge Elizabeth's severely deteriorated condition when she was admitted to Scripps, he never explained how her compromised condition impacted his conclusions.
In his May declaration, without explanation or consideration of Elizabeth's dire medical condition, Dr. Boggeln stated the life-sustaining treatment Elizabeth and Christopher had requested, including CPR, artificial nutrition, and hydration, "would not have caused her harm, and in fact would have sustained her life and improved the quality of her life." He continued by opining "to a reasonable degree of medical probability" that Defendants' "standard of care and Probate Code violations were a substantial factor in injuring, and causing or contributing to [Elizabeth's] death." The trial court sustained Defendants' objections to these opinions on the basis that they were conclusory and lacked foundation. The trial court did not abuse its discretion in reaching this conclusion.
*229 Of particular significance is the fact Dr. Boggeln never mentioned Elizabeth's advanced stage pancreatic cancer with metastases to her bones or explain how her severely compromised condition impacted his conclusion that Defendants' failures to comply with the standard of care and Probate Code substantially contributed to Elizabeth's death. Additionally, Dr. Boggeln did not address how Elizabeth's severely malnourished condition impacted her ability to receive artificial intravenous fluids or contradict defense expert evidence that intravenous fluids could have resulted in serious medical problems, including edema, reduced cardiac output, decreased lung function, discomfort, and hypotension. In short, he never explained how any of the requested treatments would have "improved her life." Nor did he acknowledge that physicians are not required to render medically ineffective health care, defined as treatment that would not offer any significant benefit. (Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4735, p. 453.)
Without at least some minimal basis, explanation, or reasoning, Dr. Boggeln's conclusions as to causation in his May declaration had no evidentiary value. ( Bushling, supra , 117 Cal.App.4th at p. 509, 11 Cal.Rptr.3d 653 [plaintiff "must show that defendants' breach of the standard of care was the cause, within a reasonable medical probability, of his injury"]; Kelley v. Trunk (1998) 66 Cal.App.4th 519, 525, 78 Cal.Rptr.2d 122 [the summary judgment "standard is not satisfied by laconic expert declarations which provide only an ultimate opinion, unsupported by reasoned explanation"].)
In an attempt to remedy the deficiencies in Dr. Boggeln's May 2016 declaration, Plaintiffs submitted amended declarations *751 in opposition to the summary judgment motions by Drs. Lugo, Mehta, and Shieh. However, Dr. Boggeln's amended declarations suffered many of the same fatal deficiencies as his original declaration. In the amended declarations, Dr. Boggeln acknowledged Elizabeth's cancer diagnosis, but never recognized how compromised her condition was when she was admitted to Scripps. Instead, he stated he was "aware that some, but not all, resuscitative measures may cause a patient injury. While [Elizabeth] suffered from cancer, [his] experience [was] that cancer patients are not barred from receiving [CPR]." Dr. Boggeln's general statement that cancer patients can receive CPR did not address evidence regarding Elizabeth's specific cancer diagnosis including metastases to her ribs, and the likelihood that CPR would have crushed them, causing excruciating pain. An "expert may not base opinion upon a comparison if the matters compared are not reasonably comparable." ( Sargon, supra , 55 Cal.4th at p. 770, 149 Cal.Rptr.3d 614, 288 P.3d 1237, citing Roscoe Moss Co. v. Jenkins (1942) 55 Cal.App.2d 369, 130 P.2d 477.) Here, Dr. Boggeln essentially compared Elizabeth to unspecified cancer patients without discussing facts pertinent to Elizabeth's specific case. *230 In his amended declarations, Dr. Boggeln also discussed defense expert opinions that Elizabeth could not tolerate artificial hydration beyond what was provided. Dr. Boggeln stated Elizabeth's medical records did not show she was harmed by tube feedings and intravenous fluids because her edema grades remained consistent from admission until her death. Dr. Boggeln implied Defendants' failures to provide Elizabeth with fluids and tube feedings led to her death because they resulted in dehydration and malnutrition. He stated, "[a]ny person, including with cancer, will die without proper fluids and nutrition." Again, Dr. Boggeln did not discuss the impact of facts pertinent to Elizabeth, including her terminal medical condition, and critically omitted any discussion of the medical effectiveness of the care Elizabeth had requested in her advance health care directive. Notably, Dr. Boggeln did not address facts that Elizabeth entered Scripps in a severely malnourished and dehydrated condition and had significant wasting of her body that could not be treated or reversed. Without addressing this critical evidence, Dr. Boggeln did not sufficiently explain how Defendants' actions caused Elizabeth injury or death or how the treatment requested in her advance health care directive would have benefitted her or sustained or improved her condition.
Finally, we note that the trial court also criticized Dr. Boggeln's declaration because he relied on the determination of a licensed vocational nurse at Emeritus that Elizabeth's prognosis was greater than six months. Plaintiffs argued the trial court was required to accept the nurse's statement as true. However, a trial court can inquire into the type of material on which an expert relies. ( Sargon, supra , 55 Cal.4th at p. 771, 149 Cal.Rptr.3d 614, 288 P.3d 1237.) " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. ..." ' " ( Id. at p. 770, 149 Cal.Rptr.3d 614, 288 P.3d 1237.)
In this case, Dr. Boggeln relied on a form a licensed vocational nurse at Emeritus had completed in which she checked a box indicating Elizabeth did not have a condition or chronic disease that may result in life expectancy of less than six months. Although the prognosis notation required physician documentation and none was included with the form, Dr. Boggeln did not address or explain that deficiency. Instead, he appeared to take the nurse's prognosis determination as *752 true without question or explanation. The trial court did not abuse its discretion in concluding Dr. Boggeln relied on an incomplete form completed by a licensed vocational nurse and disregarded other relevant evidence from Dr. Nasar concerning Elizabeth's prognosis. Accordingly, Dr. Boggeln's opinion as to Elizabeth's prognosis lacked foundation in that it was based on incomplete facts.
As will be discussed, without expert testimony on causation, Plaintiffs could not defeat summary judgment on their professional negligence and wrongful death causes of action against Defendants.
*231 2. Opinions Regarding Standard of Care Violations
In his declarations, Dr. Boggeln expressed numerous opinions regarding Defendants' alleged failures to comply with the standard of care. His opinions, however, were deficient because they did not account for each Defendant's differing role in Elizabeth's care. Instead, in discussing the alleged standard of care violations, Dr. Boggeln grouped the physician defendants and Scripps together. For example, he opined that "Scripps, Ritt, Lugo, Wiesner, Mehta, Evans, Shieh, King, Pund, and Ettari's failure to provide Dilaudid for nearly ten hours on February 20, 2013 failed to comply with the standard of care." Dr. Boggeln did not explain how each of these defendants was responsible for the failure of Elizabeth to receive pain medication during the relevant time period.
In fact, Dr. Boggeln acknowledged that some of the physicians he claimed violated the standard of care concerning pain medication did not see or treat Elizabeth on February 20, 2013. Specifically, Drs. Shieh and Wiesner had no involvement with Elizabeth's care on February 20, 2013, and members of the Appropriate Care Committee met at Elizabeth's bedside that day, but the meeting was before the relevant time period, the committee recommended pain medications, and the committee did not make any orders prescribing pain medications. Dr. Boggeln does not state why or how Drs. Shieh and Wiesner and members of the Appropriate Care Committee were responsible for the administration of pain medication on February 20, 2013.
Concerning Drs. Lugo, Mehta, and Ritt, the doctors who had provided Elizabeth medical care on February 20, 2013, Dr. Boggeln admitted that these doctors had prescribed Elizabeth pain medications. Based on the undisputed facts set forth in Dr. Boggeln's declarations, on that day at 7:45 a.m., Dr. Lugo had prescribed 1.5 milligrams of hydromorphone every two hours as needed for pain. Thereafter, at 11:50 a.m., Dr. Ritt increased the hydromorphone to two milligrams every two hours as needed for pain. At 4:00 p.m., Dr. Mehta observed Elizabeth in pain. At 6:54 p.m., Dr. Mehta placed an order for Elizabeth to receive one milligram of hydromorphone every two hours as needed for pain.
Although Dr. Boggeln opined that Drs. Ritt, Lugo, and Mehta failed to comply with the standard of care because Elizabeth did not receive pain medication between 2:02 p.m. and 11:47 p.m. on February 20, 2013, his medical chronology reveals that these doctors (the only doctors who had provided Elizabeth medical care on that day) acted consistently with the Appropriate Care Committee's recommendations by placing orders for pain *232 medications. Dr. Boggeln did not set forth what actions, if any, the doctors were required to take beyond prescribing pain medications.[7] *753 Similarly, Dr. Boggeln opined that "Scripps, Ritt, Lugo, Wiesner, Mehta, Evans, Shieh, King, Pund, Ettari, and Knight's refusal to provide [CPR] when requested by the patient and her family violated the standard of care and Probate Code." Dr. Boggeln did not individually set forth how each of the defendants was responsible for providing Elizabeth CPR. For example, Dr. Boggeln did not state how Dr. Shieh, who was merely an oncology consultant and did not make any recommendations or orders regarding CPR, violated the standard of care by refusing to provide such treatment. Further, Dr. Boggeln did not explain how Scripps, a health care institution, was responsible for providing CPR. As we previously explained, he also failed to account for the various physicians' opinions that CPR would have crushed Elizabeth's bones and caused her excruciating pain.
Most, if not all, of Dr. Boggeln's opinions about alleged standard of care violations group Defendants together without explanation as to how each was responsible for the violation. His failure to indicate how each defendant's acts constituted a violation of the standard of care renders his opinions deficient.
3. Opinions Regarding Probate Code Violations
In addition to Dr. Boggeln's opinions concerning causation and alleged standard of care violations, he also expressed opinions relevant to Plaintiffs' causes of action for statutory violations of the Probate Code. Here, Plaintiffs alleged violations of section 4730 (communication of health care decisions); section 4731, subdivision (a) (requesting and maintaining advance directive); section 4732 (recording information about capacity); section 4736 (duties upon declining to comply with a health care instruction); and section 4742, subdivision (b) (concealment or inducement to change advance directive).
In general, the Health Care Decisions Law, as codified in the Probate Code, protects an individual's right to control decisions relating to his or her own health care, including end-of-life decisions, and provides the standards governing health care decisions. The Health Care Decisions Law also provides that where there are technical violations of these sections, health care providers and health care institutions are entitled to immunity when they "act [ed] in good faith and in accordance with generally accepted health care *233 standards ...." (§ 4740.) Acting in accordance with generally accepted health care standards is equivalent to compliance with the standard of care. It is in this context we consider the trial court's rulings on Dr. Boggeln's opinions regarding these statutory violations.
a. Requesting and Maintaining Patient's Advance Directive
We start with Dr. Boggeln's opinion that the medical professional defendants violated the standard of care and Probate Code by failing to seek out and maintain Elizabeth's advance health care directive (§ 4731, subd. (a) ). On this issue, the trial court sustained Defendants' objections to Dr. Boggeln's opinions in his original and amended declarations that a POLST is different from an advance directive; and the standard of care and Probate Code require a physician who is aware of an advance directive to request a copy of it even if a POLST is already in *754 the patient's file and family members have informed the physician of the patient's end-of-life wishes. This evidence contradicted defense expert opinions on these issues.
Because Dr. Boggeln's opinion was based on his experience, was not otherwise lacking in foundation, and was relevant to whether Defendants acted in accordance with generally accepted health care standards to qualify for immunity, we conclude the trial court erred in sustaining objections to Dr. Boggeln's opinion that a physician has a duty to request the patient's advance directive even if a POLST is in the medical record.
b. Communication, Capacity, Declining to Comply with Patient's Instructions, and Concealment or Inducement to Change Advance Directive
In his declarations in opposition to Defendants' summary judgment motions, Dr. Boggeln also offered opinions relating to Probate Code sections requiring communication of health care decisions, recordation of information about a patient's capacity, medical providers' duties upon declining to comply with a patient's health care instructions, and concealment or inducement to change a patient's advance directive. He stated the physician defendants failed to comply with the standard of care and Probate Code by failing to receive informed consent regarding changes in treatment; failing to note Elizabeth's capacity; failing to continue care; and preparing a draft POLST when the patient's wishes were recorded in writing.
Again, Dr. Boggeln did not account for the Defendants' individual roles and relationships to Elizabeth. He grouped members of the Appropriate Care Committee together with treating doctors, without regard to the differences in their responsibilities to the patient. For example, he did not explain how the *234 Appropriate Care Committee members qualified as primary physicians who are required to document information about capacity. Similarly, he did not state which of the physician defendants, if any, made or were informed about a determination that Elizabeth lacked capacity, and he did not explain how any of the physicians individually failed to receive informed consent.[8]
Based on the foregoing, we conclude the trial court acted within its discretion in sustaining objections to Dr. Boggeln's opinions concerning Defendants' alleged breaches of the standard of care and violations of the Probate Code outlined above.
C. Defense Expert Declarations ***
V. Summary Judgments in Favor of Defendants
Plaintiffs argue the trial court erred in granting summary judgment on their claims for professional negligence, wrongful death, negligent misrepresentation, and statutory Probate Code violations. We address each of Plaintiffs' arguments separately and reject them for reasons we detail below.
A. Summary Judgment Principles †
B. Plaintiffs' Professional Negligence and Wrongful Death Claims
Plaintiffs argue the trial court erred in granting summary judgment on their professional *755 negligence and wrongful death claims. Specifically, they contend: (1) Dr. Boggeln's declarations created a triable issue of fact concerning negligence; (2) the trial court erred in ruling the Appropriate Care Committee members did not owe Elizabeth a duty of care; (3) expert testimony was unnecessary to prove their claim for negligence based on lack of informed consent; and (4) a presumption of negligence arose from Defendants' violations of various statutes and regulations. We reject Plaintiffs' arguments. *235 1.-3.††
4. The Appropriate Care Committee's Duty of Care
Plaintiffs challenge the trial court's finding that Drs. Evans, Boyd-King, Ettari, and Pund (members of Scripps's Appropriate Care Committee) did not owe Elizabeth a duty of care.
" 'Whether a defendant owes a duty of care is a question of law.' " ( Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc. (1989) 48 Cal.3d 583, 588, 257 Cal.Rptr. 98, 770 P.2d 278.) A physician's duty of care to a patient does not arise until a physician-patient relationship is established. ( Mero, supra , 31 Cal.App.4th at p. 1471, 37 Cal.Rptr.2d 769.) When a physician-patient relationship exists, "the patient has a right to expect the physician will care for and treat him with proper professional skills and will exercise reasonable and ordinary care and diligence toward the patient [citation]." ( Keene v. Wiggins (1977) 69 Cal.App.3d 308, 313, 138 Cal.Rptr. 3.)
Several courts have found a physician-patient relationship does not exist where the physician does not affirmatively treat or directly advise the patient. ( Rainer v. Grossman (1973) 31 Cal.App.3d 539, 542-543, 107 Cal.Rptr. 469 [holding a physician and professor of medicine did not have a physician-patient relationship under circumstances in which he recommended to a treating physician during a lecture that the treating physician's patient undergo surgery]; Clarke v. Hoek (1985) 174 Cal.App.3d 208, 211, 219 Cal.Rptr. 845 [holding a physician who acted as a proctor during surgery to evaluate surgeon's competence did not have a physician-patient relationship with patient undergoing surgery]; Keene v. Wiggins, supra , 69 Cal.App.3d at pp. 310-311, 138 Cal.Rptr. 3 [holding no physician-patient relationship created where physician examined plaintiff for purpose of rating the plaintiff's injury for employer's insurance carrier in workers' compensation proceeding]; Felton v. Schaeffer (1991) 229 Cal.App.3d 229, 234, 279 Cal.Rptr. 713 [holding no physician-patient relationship where defendants evaluated plaintiff solely for the purpose of a pre-employment physical examination].) Whether a duty of care is owed is decided on a case-by-case basis. ( Mintz v. Blue Cross of California (2009) 172 Cal.App.4th 1594, 1610, 92 Cal.Rptr.3d 422.)
In this case, members of the Appropriate Care Committee evaluated Elizabeth's medical history, provided an opinion on what constituted medically ineffective care, and made recommendations when the treating physicians' plan of care was inconsistent with the patient's directives. Although *236 these facts are not identical to those cases in which a physician conducted a pre-employment physical examination requested by the employer, rated an industrial injury for an insurance carrier, acted as a proctor to assess a colleague's competence, or opined on a case history in the context of an educational lecture, the cases make clear the critical inquiry is the nature of the relationship and contact between the physician and patient. *756 Under the circumstances of this case, we conclude Drs. Evans, Boyd-King, Ettari, and Pund did not have a physician-patient relationship with Elizabeth sufficient to impose upon them a duty of care. These doctors were members of the Appropriate Care Committee, a team of volunteer physicians who provided recommendations when treating physicians' plan of care conflicted with the patient's wishes. Although the Appropriate Care Committee doctors met at Elizabeth's bedside, they did not treat Elizabeth. Rather, their role was limited to reviewing Elizabeth's medical records, considering the impressions of her consulting and treating physicians, and observing Elizabeth for the purpose of making recommendations that Elizabeth's treating physicians could accept or reject. The Appropriate Care Committee doctors' actions were insufficient to give rise to a physician-patient relationship and associated duty of care to Elizabeth.
Further, committees such as the Appropriate Care Committee serve a valuable role in patient care. They act as an independent review of what constitutes medically ineffective care and the patient's best interests when a treating physician declines to comply with a patient's health care instruction. The imposition of liability under these circumstances would be counterproductive to a valuable health care resource and would discourage physicians from participating in volunteer committees that serve an important and difficult role in circumstances in which medical providers believe complying with a patient's directives would be medically ineffective and cause the patient harm. For these reasons, public policy considerations militate against imposing a duty of care in this case.
5. Negligence Per Se†††
C. Alleged Probate Code Violations
Plaintiffs alleged Defendants violated multiple provisions of the Health Care Decisions Law, including sections 4730, 4731, subdivision (a), 4732, 4736, and 4742, subdivision (b). A health care provider or health care *237 institution that intentionally violates these sections is subject to liability to the aggrieved individual for damages plus attorney fees. (§ 4742, subd. (a).)
"The main purpose of the Health Care Decisions Law is to provide 'procedures and standards' governing 'health care decisions to be made for adults at a time when they are incapable of making decisions on their own and [to] provide[ ] mechanisms for directing their health care in anticipation of a time when they may become incapacitated.' " ( Conservatorship of Wendland (2001) 26 Cal.4th 519, 539, 110 Cal.Rptr.2d 412, 28 P.3d 151.) "In recognition of the dignity and privacy a person has a right to expect, the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn." (§ 4650, subd. (a).) Thus, among its provisions, the Health Care Decisions Law allows a person to make future health care decisions by executing an advance health care directive. (§§ 4605, 4670.)
However, there are exceptions to a patient's right to control his or her own health care. "A health care provider or health care institution may decline to comply with an individual health care instruction or health care decision that requires medically ineffective health care or health care contrary to generally accepted health care standards applicable to the health *757 care provider or institution." ( § 4735.) " 'Medically ineffective health care,' ... means treatment which would not offer the patient any significant benefit." (Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4735, p. 453.)
1. Immunity Under Section 4740
The trial court found Defendants were immune from liability under section 4740 for alleged violations of the Health Care Decisions Law because Defendants acted in good faith and in accordance with generally accepted health care standards. Plaintiffs contend the trial court erred in finding Defendants were immune from liability.
Under section 4740, "[a] health care provider or health care institution acting in good faith and in accordance with generally accepted health care standards applicable to the health care provider or institution is not subject to civil or criminal liability or to discipline for unprofessional conduct for any actions in compliance with [the Health Care Decisions Law ], including, but not limited to, ...: [¶] ... [¶] (d) Declining to comply with an individual health care instruction or health care decision, in accordance with Sections 4734 to 4736, inclusive." (Italics added.)
Plaintiffs first argue that for Defendants to have immunity under section 4740, they had to satisfy three requirements: (1) Defendants must *238 have acted in good faith, (2) in accordance with generally accepted health care standards, and (3) " 'in compliance' " with the Health Care Decisions Law. In other words, Plaintiffs read section 4740 to mean Defendants cannot have immunity if they violated the provisions of Health Care Decisions Law from which they seek immunity. However, statutory immunities apply where the entity or individual claiming immunity "would otherwise be liable under general principles of law." ( Caldwell v. Montoya (1995) 10 Cal.4th 972, 985, 42 Cal.Rptr.2d 842, 897 P.2d 1320 ; Nasrawi v. Buck Consultants LLC (2014) 231 Cal.App.4th 328, 340, 179 Cal.Rptr.3d 813 [" 'Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant ... would be liable in the absence of such immunity.' "].) Plaintiffs' interpretation of section 4740 would render the immunity meaningless because if a party claiming immunity had strictly complied with the Health Care Decisions Law, there would be no need for immunity. Immunities by their nature shield qualified parties from liability for legal violations. Accordingly, we conclude Defendants are immune from liability under section 4740 if they acted in good faith and in accordance with generally accepted health care standards.
Here, Defendants produced evidence that they acted in good faith, and Plaintiffs did not present contradictory evidence raising a triable issue of fact. In particular, Defendants' experts stated Defendants' "actions, orders, recommendations and communications were directed at providing only medically beneficial and medically effective care to the patient without causing her further pain, suffering or harm." Although the experts did not use the term "good faith," their statements establish the substance of that requirement. Specifically, evidence that Defendants' actions were directed at providing only medically beneficial and effective care to Elizabeth without causing further pain, suffering, or harm is equivalent to a statement that they acted consistent with their moral and ethical obligations to do no harm to their patient.
Moreover, Defendants presented evidence that the Appropriate Care Committee informed Christopher that physicians could not provide Elizabeth with care they determined was futile because doing so would be outside the bounds of their ethical *758 duties as physicians. Defendants' decisions to withhold the treatment requested in Elizabeth's advance health care directive was consistent not only with their ethical duties, but also with the Health Care Decisions Law. A physician may decline to comply with a patient's health care instruction that requires medically ineffective health care, which is treatment that would not offer the patient any significant benefit. ( § 4735 ; Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4735, p. 453.) Indeed, the California Legislature has recognized that "health care [that] does not improve the prognosis for recovery may violate patient dignity and cause unnecessary pain and suffering, while providing nothing *239 medically necessary or beneficial to the person." ( Prob. Code, § 4650, subd. (b).) Defendants' evidence that they undertook care of Elizabeth within the bounds of their ethical duties supports a finding that they acted in good faith.
Plaintiffs did not present evidence that Defendants had a lack of good faith or acted with a dishonest purpose. Thus, the uncontradicted evidence established Defendants acted in good faith.
Similarly, the defense expert declarations were sufficient to establish Defendants acted in accordance with generally accepted health care standards concerning communication of health care decisions (§ 4730), recording information about Elizabeth's capacity (§ 4732), fulfilling their duties upon declining to comply with Elizabeth's health care instructions (§ 4736), and suggesting Elizabeth's family members change her health care instructions, including by preparing a draft POLST (§ 4742, subd. (b) ). Specifically, Defendants presented evidence through expert declarations that they acted reasonably, appropriately, and within the standard of care in performing these actions. Compliance with the standard of care means Defendants acted in accordance with generally accepted health care standards. ( Osborn v. Irwin Memorial Blood Bank (1992) 5 Cal.App.4th 234, 282, 7 Cal.Rptr.2d 101 [standard of care is defined "as skill and knowledge 'ordinarily possessed and exercised' in a profession"], italics omitted.)
Plaintiffs did not present admissible evidence to the contrary because, as we previously explained, the trial court did not abuse its discretion in striking Dr. Boggeln's conclusory opinions that Defendants violated the standard of care with respect to communicating health care decisions, recording Elizabeth's capacity, recommending Elizabeth not undergo advanced life support measures, and preparing a draft POLST that changed Elizabeth's health care instructions. (See part IV.B.3.b, ante .)
Based on the foregoing, we conclude the trial court did not err in finding Defendants were immune from liability under section 4740 for alleged violations of sections 4730, 4732, 4736, and 4742, subdivision (b).
On Plaintiffs' remaining Probate Code claim, alleging Defendants violated section 4731, subdivision (a) by failing to request and maintain a copy of Elizabeth's advance health care directive in her medical record, the parties produced conflicting evidence on whether Defendants complied with the standard of care. Accordingly, the trial court erred in concluding Defendants were immune from violations of section 4731, subdivision (a). However, in their opening brief, Plaintiffs did not argue that the trial court erred in granting summary judgment on their section 4731, subdivision (a) claim against Drs. Lugo, Mehta, and Shieh. Thus, we need not consider section *240 4731, subdivision (a) as it relates to these physicians. (See part V.A, ante .) As we explain below, the trial court properly granted summary judgment in favor of the *759 Scripps Defendants and Dr. Ritt on Plaintiffs' section 4731, subdivision (a) cause of action.
2. Requesting and Maintaining Patient's Advance Directive (Section 4731)
Plaintiffs argue the trial court erred in granting summary judgment on their section 4731, subdivision (a) claim against the Scripps Defendants and Dr. Ritt because these defendants knew of Elizabeth's advance health care directive, yet failed to request a copy and maintain it in her chart.
Section 4731, subdivision (a), provides: "A supervising health care provider who knows of the existence of an advance health care directive ... shall promptly record its existence in the patient's health care record and, if it is in writing, shall request a copy. If a copy is furnished, the supervising health care provider shall arrange for its maintenance in the patient's health care record." (Italics added.)
Preliminarily, we must consider whether the Scripps Defendants and Dr. Ritt were supervising health care providers because section 4731 applies only to those providers. Supervising health care providers are either the patient's primary physician or the health care provider who has undertaken primary responsibility for the patient's health care. (§ 4641.) A "[p]rimary physician" is "a physician designated by a patient or the patient's agent, conservator, or surrogate, to have primary responsibility for the patient's health care or, in the absence of a designation or if the designated physician is not reasonably available or declines to act as primary physician, a physician who undertakes the responsibility." (§ 4631.)
Because there is no indication in the record that Elizabeth or Christopher, as her surrogate, designated a primary physician, we must consider whether Defendants undertook primary responsibility for Elizabeth's health care.
The Scripps Defendants include Scripps, Knight, and Drs. Evans, Boyd-King, Pund, and Ettari. Plaintiffs argue Knight qualified as a supervising health care provider because she undertook primary responsibility for Elizabeth's discharge planning. However, it was undisputed that, in this case, the physicians made transfer decisions and recommendations, not Knight, who was merely acting to facilitate those decisions. By assisting with Elizabeth's transfer to another facility, Knight did not undertake primary responsibility for Elizabeth's health care. Thus, she was not a supervising health care provider for purposes of section 4731.
*241 Plaintiffs do not explain how Scripps, a hospital, qualified as a supervising health care provider. The Health Care Decisions Law distinguishes between health care providers (§ 4621) and health care institutions (§ 4619). Health care providers are individuals providing health care, whereas health care institutions are institutions, facilities, or agencies authorized to provide health care. While Scripps may be a health care institution, it is not a health care provider within the meaning of the Health Care Decisions Law because it is not an "individual." (§ 4621.) Accordingly, it is also not a supervising health care provider. Plaintiffs have not provided authority to the contrary.
Plaintiffs contend Drs. Evans, Boyd-King, Pund and Ettari, as members of the Appropriate Care Committee, were supervising health care providers because they decided the care Elizabeth would receive while she was at Scripps. However, as we previously explained, the evidence established the Appropriate Care Committee members made recommendations to Elizabeth's treating *760 physicians. The treating physicians could accept or reject the committee's recommendations as they saw fit. Plaintiffs did not present contradictory evidence. Further, the Appropriate Care Committee doctors did not have a physician-patient relationship with Elizabeth. (See part V.B.4, ante .) Under these circumstances, Drs. Evans, Boyd-King, Pund, and Ettari were not supervising health care providers because they did not assume primary responsibility for Elizabeth's health care.
Plaintiffs also suggest Dr. Evans was a supervising health care provider because he was chief of staff at Scripps and Drs. Ritt and Lugo sought his advice. Plaintiffs do not cite to any authority stating a hospital's chief of staff is a supervising health care provider solely by virtue of his or her role within the hospital. Further, Plaintiffs do not cite to evidence establishing Dr. Evans undertook primary responsibility for Elizabeth's health care.
We assume Dr. Ritt was a supervising health care provider for purposes of section 4731. We nevertheless conclude the trial court properly granted summary judgment in Dr. Ritt's favor on Plaintiffs' section 4731, subdivision (a) cause of action.
Section 4731, subdivision (a) requires a supervising health care provider who knows of a patient's advance health care directive to record its existence in the patient's health care record, request a copy if it is in writing, and maintain a copy in the patient's health care record if it is furnished. For a supervising health care provider to be subject to liability for violating that section, the provider must have intentionally committed the violation. (§ 4742 [stating "[a] health care provider ... that intentionally violates this part [, *242 which includes section 4731,] is subject to liability to the aggrieved individual for damages of two thousand five hundred dollars ($2,500) or actual damages resulting from the violation, whichever is greater, plus reasonable attorney's fees"].)
Plaintiffs produced evidence Christopher informed Dr. Ritt of the contents of Elizabeth's advance health care directive, but Dr. Ritt did not request a copy. Elizabeth's health care record noted she had an advance directive. However, the record did not include a copy of it. Instead, Elizabeth's chart contained a POLST, which confirmed Christopher's representation of the contents of Elizabeth's advance directive.
According to Dr. Ritt's expert, Dr. Roeland, a POLST is often considered the same as an advance directive, the reference in Elizabeth's chart to an advance directive likely referred to a POLST, and Dr. Ritt was not required to request a copy of Elizabeth's advance health care directive. Plaintiff's expert, Dr. Boggeln, contradicted Dr. Ritt's expert by opining a POLST is different than an advance directive, and a physician who is aware of an advance directive should request a copy of it even if the patient's file contains a POLST and the patient's family has confirmed the contents of the advance directive.
Despite the conflicting opinions as to whether Dr. Ritt should have requested a copy of Elizabeth's advance directive, the trial court did not err in granting summary judgment because there was no evidence that Dr. Ritt intentionally violated section 4731, subdivision (a), which was required to subject him to liability. (§ 4742.) The evidence established Dr. Ritt knew of the contents of Elizabeth's advance health care directive requiring advanced life support measures to prolong her life. He did not request a copy of the advance directive because he believed Christopher's representations regarding its contents. Dr. Ritt thought Elizabeth should not undergo advanced life support *761 measures because those measures would cause her harm and were not in her best interests. Accordingly, Dr. Ritt spoke to Dr. Evans and initiated steps to involve the Appropriate Care Committee. This evidence is inconsistent with a finding that Dr. Ritt intentionally violated section 4731. Plaintiffs did not produce contradictory evidence concerning Dr. Ritt's intent.
Moreover, the purpose of the recording requirement in section 4731 is to "reduce[ ] the risk that a health-care provider or institution, or agent, [conservator] or surrogate, will rely on an outdated individual instruction or the decision of an individual whose authority has been revoked." (Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4731, p. 448.) There was no evidence that Dr. Ritt, or any other health care provider, relied on an outdated instruction or the decision of an individual *243 whose authority had been revoked. To the contrary, Elizabeth's health care providers were aware of Elizabeth's life support wishes and Christopher's ability to make decisions for her. No evidence established Dr. Ritt's failure to request a copy of Elizabeth's advance health care directive caused her injury or death.
Based on the foregoing, we conclude the trial court properly granted summary judgment in favor of the Scripps Defendants and Dr. Ritt on Plaintiffs' cause of action for violation of section 4731, subdivision (a).
D. Plaintiffs' Negligent Misrepresentation Claim *†
VI.-VIII.*†
DISPOSITION
The judgment in favor of Dr. Ritt is reversed to the extent it holds Christopher and McDermet responsible for Dr. Ritt's expert costs in the amount of $6,000. In all other respects, the judgments are affirmed. Defendants are entitled to costs on appeal.
WE CONCUR:
O'ROURKE, J.
DATO, J.

For purposes of clarity, we refer to Elizabeth Alexander, Clenton Alexander, and Christopher Alexander by their first names.

Plaintiffs requested we take judicial notice of (1) a California Law Revision Commission recommendation regarding "Health Care Decisions for Adults Without Decisionmaking Capacity," and (2) a document from the California Medical Association, entitled "Legal and Ethical Principles Applicable to Requests for Medically Ineffective or Non-Beneficial Treatment." These documents were not presented to the trial court. Plaintiffs offer no explanation for their failure to request judicial notice in the trial court and we discern no "exceptional circumstances" that would justify deviating from the general rule that reviewing courts do not take judicial notice of documents not presented to the trial court. (Vons Companies, Inc. v. Seabest Foods, Inc . (1996) 14 Cal.4th 434, 444, fn. 3, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)

We refer to Scripps; nurse Knight; and Drs. Evans, Boyd-King, Pund, and Ettari together as the Scripps Defendants. We refer to the Scripps Defendants together with Drs. Ritt, Lugo, Mehta, and Shieh as Defendants.

Undesignated statutory references are to the Probate Code.

See footnote *, ante .

Plaintiffs did not allege who was responsible for the administration of pain medications, as prescribed by Elizabeth's physicians, nor did they sue any nurses who may have been involved in the administration of pain medications. Further, Plaintiffs did not contend in opposition to Defendants' summary judgment motions that Scripps or the physician defendants were liable for any nurse's administration of pain medications by virtue of an employment relationship.

For similar reasons, we conclude the trial court acted within its discretion in sustaining objections to Dr. Boggeln's opinions concerning whether Defendants fulfilled their duties upon declining to comply with Elizabeth's health care instructions and whether Defendants concealed or induced Elizabeth or Christopher to change Elizabeth's advance directive.

See footnote *, ante .

See footnote *, ante .

See footnote *, ante .

See footnote *, ante .

See footnote *, ante .