Filed 5/15/23  Gray v. Eisenhower Medical Center CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| BERNARD GRAY et al., | D080915 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. PSC1902364) |
| EISENHOWER MEDICAL CENTER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Riverside County, Ronald L. Johnson, Judge.  Reversed.

Abir Cohen Treyzon Salo, Boris Treyzon, Borislav Kasreliovich and Joseph R. Finnerty; Esner, Chang, Boyer & Murphy, Holly N. Boyer and Shea Sierra Murphy for Plaintiffs and Appellants.

Agajanian, McFall, Weiss, Tetreault & Crist and Philip Weiss for Defendant and Respondent.

Plaintiffs and appellants Bernard Gray, Nancy Gray and Victoria Gray[1] appeal a summary judgment entered in favor of defendant and respondent Eisenhower Medical Center (Eisenhower) on plaintiffs' complaint

---

1    References to Gray are to Bernard Gray.

for, inter alia, negligence, and premises liability arising out of Gray's fall from a rolling walker (also referred to by the parties as a rollator) just outside of Eisenhower's entryway. Sustaining most of Eisenhower's evidentiary objections to plaintiffs' opposing summary judgment expert declaration, the trial court ruled Eisenhower presented expert testimony that the location where the incident occurred complied with applicable codes and regulations and did not otherwise constitute a dangerous condition. Challenging the court's evidentiary rulings, plaintiffs contend: (1) analyzing the issue under the California Supreme Court's rubric for assessing the existence of a duty of care, Eisenhower owed a duty of care for the condition of its medical center; (2) by conceding there was a one-fourth inch tripping hazard at its entrance, Eisenhower failed to carry its summary judgment burden to establish the absence of a triable issue of material fact; and (3) their evidence in any event raised a triable issue of fact as to whether the entryway complied with the Americans with Disability Act (ADA) and California Building Standards Code. Plaintiffs argue that given the existence of fact questions for the jury, the court erred by granting summary judgment on derivative loss of consortium and emotional distress causes of action.

We hold Eisenhower did not meet its initial summary judgment burden of production on the issues of duty of care and breach of duty, the sole elements of negligence Eisenhower challenged in its motion. Because these arguments formed the basis for Eisenhower's claim that plaintiffs could not establish derivative loss of consortium and bystander emotional distress causes of action, summary judgment was improperly granted as to those claims as well. We reverse.

2

FACTUAL AND PROCEDURAL BACKGROUND

In April 2017, Gray suffered personal injuries after falling off a rolling walker outside of Eisenhower's entryway.  Just beforehand, Gray's daughter had pushed him through the medical center's lobby and two sets of double doors while he was seated on the walker facing her; Gray fell when the walker's front wheels struck a metal plate spanning the length of the walkway.[2]

Gray, his wife and daughter filed a complaint alleging causes of action against Eisenhower for negligence, premises liability, infliction of emotional distress, and loss of consortium.[3]  Alleging they were visitors and/or invitees, they alleged Eisenhower "negligently maintained, managed, controlled and operated the . . . Medical Center, in that they [*sic*] failed to warn of or make safe the raised offset outside of the center's entrance/exit"; that Eisenhower "was aware or should have been aware that the nature of the raised offset outside of the entrance/exit created a hazard to individuals visiting the center"; and it was "entirely foreseeable that patrons, visitors and patients

---

[2]    Plaintiffs summarized these facts in their opposing separate statement based on Gray's and his daughter's deposition excerpts.  In its reply separate statement, Eisenhower objected to the summary as irrelevant, immaterial, lacking in foundation and misstating the evidence.  In its summary judgment points and authorities, however, Eisenhower described the incident as follows:  "With [Gray] sitting facing backwards and [Gray's daughter] pushing the [r]ollator forward, the front wheels of the [r]ollator eventually made contact with [the] joint cover.  Consequently, given [Gray's] positioning, momentum, and simple physics, the [r]ollator, with [Gray] still seated, fell backwards onto the walking surface."  Setting aside the argumentative portions, we see no material inconsistency between Eisenhower's description and plaintiffs' evidence.

[3]    Plaintiffs sued other defendants and alleged causes of action against them that are not at issue in this appeal.

would be entering/exiting the medical center without knowledge of the raised offset." They alleged Eisenhower in the exercise of reasonable care "should have known that the raised offset constituted a dangerous condition and unreasonable risk of harm, especially in light of its proximity to the entrance/exit." They alleged Eisenhower had a duty to maintain its property accessible to the public for safe use of visitors and invitees, and had a duty to discover and warn of foreseeable dangerous conditions, but breached those duties. Victoria Gray and Nancy Gray respectively alleged causes of action for negligent infliction of emotional distress and loss of consortium.

Eisenhower moved for summary judgment. It argued it had no duty to protect plaintiffs and its conduct did not constitute a breach of the applicable standard of care. Specifically, Eisenhower maintained its premises— including the metal plate, which covered a seismic expansion joint in the walkway—were fully compliant with all codes and regulations, and thus the premises were not dangerous or defective. Eisenhower further argued plaintiffs misused the rolling walker as if it were a wheelchair contrary to warnings in the product's owner's manual. According to Eisenhower, the misuse was unforeseeable thus negating any duty of care on its part. It also argued that because the metal joint cover conformed to all applicable standards and guidelines, Eisenhower did not breach any duty of care.

Eisenhower submitted a declaration from an expert, Sam Iler, who stated he was a board certified safety and health manager as well as a construction health and safety technician and general contractor. Iler stated he had inspected the premises and reviewed ADA provisions applying to the walking surface where the incident occurred and concluded:

4

"a.  The location of the incident was constructed within applicable building and accessibility requirements and codes designed to facilitate the use of accessibility aids such as wheelchairs and other mobility devices.

"b.  The walkway has a required structural seismic expansion joint/gap . . . , which allows for the differential movement of the walkway structure independently from the adjacent hospital structure.

"c.  The joint/gap is covered by a commercial grade seismic joint cover constructed of metal ('joint cover').

"d.  The joint cover is part of a required system specifically designed for the application utilized in this case.

"e.  The joint cover conforms to local, state and ADA requirements relative to the use of wheelchairs and other mobility devices."

Iler further averred that the walkway was subject to governmental requirements for an "accessible walkway," and the metal joint cover met the applicable standards because his measurements showed it had a less than [one-fourth] inch vertical deviation from the walking surface.  He stated: "For an accessible walkway, any 'vertical deviation,' i.e., height, above the adjacent walking surface may be as great as [one-half] inch (with beveled vertical edges) or [one-fourth] inch (with non-beveled vertical edge). [¶] . . . [¶] . . . Because the height measurement of the joint cover did not exceed [one-fourth] inch, the joint cover falls within applicable standards for both beveled *and* non-beveled vertical edges."

In opposition, plaintiffs argued Eisenhower did not meet its burden on summary judgment to negate the duty or breach elements of their claims in that it offered no expert evidence to show their use of the rolling walker as a wheelchair was unforeseeable or that the edges of the raised metal threshold were beveled.  They argued that contrary to Eisenhower's arguments, the

5

product warning "conclusively establishe[d]" the use of the rollator as a wheelchair was foreseeable. They argued Eisenhower owed a duty as a landowner to keep its premises safe, and that it was foreseeable that a raised offset at a hospital entrance may pose a danger to patrons who are elderly and/or convalescing from serious injuries. According to plaintiffs, Eisenhower could not rely on a product misuse defense because it was inapplicable to a premises liability case and because Eisenhower had not pleaded such a defense in its answer. They argued Eisenhower could not establish the defense as a matter of law in any event.[4] As for breach, plaintiffs argued they presented expert evidence—a declaration from civil engineer and safety expert Brad Avrit—that the raised metal threshold violated the ADA at the time of the fall, and thus Eisenhower breached its duty to Gray.

Avrit opined that the premises where Gray was injured were in an unsafe condition at the time of the incident. He averred that members of his staff had taken photographs and measurements of the area in June 2018 and December 2019, and he inspected, took measurements and photographed the area in August 2021. Avrit stated the measurements taken by him and his staff were greater than those taken by Eisenhower's expert, and based on ADA and 2016 California Building Standards Code requirements the height differential between the metal threshold and concrete walkway violated the ADA and the California Building Standards Code at the time of the incident.

---

[4]     Plaintiffs objected to Iler's declaration on numerous grounds. The trial court overruled all of the objections, and plaintiffs do not challenge those evidentiary rulings on appeal.

Avrit detailed both the measurements he and his staff had taken and the ADA and 2016 California Building Standards Code.[5]

Avrit averred: "Ambulation assist devices such as walkers and rollators, like Mr. Gray's rollator, can become impeded by abrupt height differentials and as such require smooth transitions between elevation differences. It is foreseeable that people in a hospital and medical center like Eisenhower Medical Center would be using ambulation assist devices like walkers or rollators. It is foreseeable that people with walkers and rollators would travel through the subject location since it is a main entrance/exit of the facility and would be considered a high traffic area." Avrit opined based on his education, training, and experience, it was "more

[5]     Avrit stated: "At the time of [the] site inspection of June 1, 2018, the subject height differential between the metal cover and adjoining concrete walkway measured 5/16 [inches] (0.31 inches) to 7.5/16 [inches] (0.46 inches). At [the] second site inspection of December 13, 2019, the subject height differential between the metal cover and adjacent concrete walkway measured between 4.5/16 [inches] (0.28 inches) to 12.5/32 [inches] (0.39 inches) . . . . At the time of my own inspection of August 18, 2021, the subject height differential measured between 11/32 [inches] (0.34 inches) to 13/32 [inches] (0.40 inches) with slopes at the leading edge of the cover ranging from 53.0 [percent] to 61.7 [percent] slope. The slope was measured by placing a digital level flush with the sloped leading edge of the metal cover. The measurements that I took at my inspection in August, 2021 are consistent with the measurements taken by [Avrit's staff member] in June, 2018 and [Avrit's staff member] in December, 2019." Avrit stated: "Based on the [ADA] standards and the 2016 California Building [Standards] Code . . . , height differentials between 1/4 inch and 1/2 inch must be beveled with a slope no greater than 1:2 meaning that for every 1 unit of vertical displacement will result in 2 units of horizontal displacement equating to a 50.0 [percent] slope. Based on the measurements taken on each of [Avrit's company's] inspections, the subject height differential between the metal threshold and concrete walkway was a violation of the ADA and the California Building [Standards] Code at the time of the incident. The beveled change in level in the threshold exceeded the 1:2 (50.0 [percent]) requirement and instead measured a max of 61.7 [percent]."

likely than not that the subject incident would not have occurred had the cover been flush mounted with the adjacent concrete, or been properly sloped at the leading edge." He also opined based on several factors that the height differential was difficult to perceive at the time of the incident. He concluded that "the existence of the vertical height differential between the metal threshold and concrete walkway is a dangerous tripping and tipping hazard that was a substantial factor in causing the subject incident. If there was not a height differential, it is more likely than not that this incident would not have happened."

Eisenhower objected to Avrit's declaration on grounds the entire declaration was irrelevant because it was predicated on inspections that were unauthorized and not properly conducted, that some of his conclusions and methods lacked foundation, and other conclusions and statements called for speculation, were conclusory and/or were irrelevant.

Overruling two of Eisenhower's evidentiary objections and sustaining the rest,[6] the trial court granted Eisenhower's motion and entered summary judgment "for the reasons set forth in [Eisenhower's] motion." The court stated its decision was "based upon [Eisenhower's] submission of expert testimony in support of its contention that the area where the incident occurred was in compliance with applicable codes and regulations and did not otherwise constitute a dangerous condition, the sustaining of [Eisenhower's]

_____

[6] The trial court overruled Eisenhower's relevance objection to the entirety of Avrit's declaration, which was based on a claim that his and his staff's inspections were "improperly conducted" and his findings thus "ha[d] no evidentiary value." It also overruled Eisenhower's objection that a sentence in paragraph No. 13 of Avrit's declaration—where Avrit stated ambulation assist devices like Gray's rollator can become impeded by abrupt height differentials and required smooth transitions between elevation differences—was speculative, lacked foundation and was irrelevant as " 'more akin to "advocating, not testifying." ' "

8

evidentiary objections (Nos. 2-5 and 7-10) to the declaration of plaintiffs' safety [expert] Brad Avrit, the denial of plaintiffs' evidentiary objections, and all other matters considered by the Court."

Plaintiffs filed this appeal from the ensuing judgment.

DISCUSSION

I. *General Summary Judgment Principles and Standard of Review*

" 'Summary judgment is appropriate only "where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law." ' [Citation.] A moving defendant bears the burden to show that the plaintiff cannot establish one or more essential elements of the cause of action, or that there is a complete defense to that cause of action. [Citations.] If the defendant meets this burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or defense thereto.' [Citation.] We review an order granting summary judgment de novo, 'liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' " (*Hassaine v. Club Demonstration Services, Inc.* (2022) 77 Cal.App.5th 843, 849-850 (*Hassaine*), in part citing *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) "[A]ny doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.)

II. *Eisenhower's Initial Summary Judgment Burden*

Plaintiffs advance two contentions that impliedly or expressly bear on Eisenhower's initial summary judgment burden. They first contend Eisenhower's argument that their assertedly unforeseeable misuse of the rolling walker relieved it of its duty of care is a "profound misunderstanding

9

of how [foreseeability] operates in the context of a duty analysis." Plaintiffs argue foreseeability for purposes of assessing whether a defendant owes a duty of care looks not to specifics of a case, but to whether entire categories of claims can be excluded from an existing duty, and under the proper analysis of policy considerations that warrant excluding certain kinds of plaintiffs or injuries from relief, there is no basis to relieve Eisenhower of a duty of care.

Second, plaintiffs contend Eisenhower did not meet its initial summary judgment burden on the issue of breach. They point out Eisenhower concedes the expansion gap plate created an approximately one-fourth inch tall tripping hazard at its entrance but claims the height differential complied with applicable ADA or California Building Standards Code requirements. According to plaintiffs, compliance with laws or safety regulations is not dispositive of whether Eisenhower exercised due care, and thus Eisenhower did not show as a matter of law that it acted with due care.

As we explain, both contentions have merit.

A. *Additional Legal Principles*

Eisenhower's burden of production as the moving party was "to make a prima facie showing of the nonexistence of any triable issue of material fact . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) It could meet this burden by showing the plaintiffs " ' "ha[d] not established, and [could not] reasonably expect to establish," ' the elements of [their] cause of action." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) To do so, Eisenhower was obligated to either "present evidence that . . . conclusively negates an element of . . . the plaintiffs' causes of action or shows that plaintiffs do not possess, and cannot reasonably obtain, evidence necessary to establish at least one element of each cause of action." (*Taylor v. Financial Casualty & Surety, Inc.* (2021) 67 Cal.App.5th 966, 979; see also *Aguilar*, at

10

p. 855 ["defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action" and may also present evidence plaintiff does not possess, and cannot reasonably obtain, needed evidence]; *Usher v. White* (2021) 64 Cal.App.5th 883, 893.)

When a summary judgment motion does not " 'negate theories of [defendant's] liability, the trial court should [hold] that [the defendant] failed to carry [its] initial burden and stop[ ] there.' " (*Hedayati v. Interinsurance Exchange of the Automobile Club* (2021) 67 Cal.App.5th 833, 846.) In that event, " 'it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied.' " (*Mireskandari v. Edwards Wildman Palmer LLP* (2022) 77 Cal.App.5th 247, 256-257; see also *Scheer v. Regents of the University of California* (2022) 76 Cal.App.5th 904, 914-915 [superior court's " 'assessment of whether the moving party has carried its burden—and therefore caused a shift—*occurs before the court's evaluation of the opposing party's papers' to the motion for summary judgment*"].)

B. *Duty*

"The general rule is that a landowner 'owes certain affirmative duties of care, as to conditions or activities on the land, to persons who come on the land.' [Citation.] [Civil Code s]ection 1714 provides that every person 'is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property . . . .' ([Civ. Code,] § 1714, subd. (a).) Under [Civil Code] section 1714, landowners owe a duty to exercise ordinary care in managing their property in light of the foreseeability of injury to others." (*Hoffman v. Young* (2022) 13 Cal.5th 1257, 1266; *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1156 [persons have a duty to maintain land in their possession and control in a reasonably safe condition]; see generally *Kesner v.*

11

*Superior Court* (2016) 1 Cal.5th 1132, 1142-1143 (*Kesner*) [stating general duty rule as to "each person"]; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 [general rule applies to " '[e]veryone' "]; *Hassaine, supra*, 77 Cal.App.5th at p. 851 [describing Civil Code section 1714 as reflecting a "default rule"].) Businesses in particular have a common law duty of ordinary care to their customers that extends to the floors or walking surfaces of the business that they are likely to pass over, including passageways outside the premises over which they have control. (See *Hassaine*, at pp. 847, 852 [store owner or possessor "has the duty 'to exercise ordinary care and prudence to keep the aisles and passageways of the premises in and through which, by their location and arrangement, a customer in making purchases is induced to go, in a reasonably safe condition so as not unnecessarily to expose the customer to danger or accident' "; the "duty extends to all parts of the premises over which the proprietor has control"]; *Tuttle v. Crawford* (1936) 8 Cal.2d 126, 130 ["That it is the duty of storekeepers to keep the floors of their premises safe for those who must pass over them in the transaction of their business must be conceded"]; *Johnston v. De La Guerra Properties* (1946) 28 Cal.2d 394, 401 [restaurant tenant had a duty to maintain a common passageway outside leased premises in a safe condition if he exercises control over it].)

A conclusion that a defendant does not owe a duty "constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." (*Kesner, supra*, 1 Cal.5th at p. 1143.) The "concept of duty . . . is a legal device . . . designed to curtail the feared propensities of juries toward liberal awards. [Citation.] As a result, 'in the absence of a statutory

12

provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where "clearly supported by public policy." ' " (*Ibid*.; *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 217; *Hassaine*, *supra*, 77 Cal.App.5th at p. 851.) To decide whether to depart from the general duty applicable to all persons, courts balance what are now commonly referred to as the *Rowland* factors: " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Brown v. USA Taekwondo*, at p. 217, citing *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113.) "Three factors—foreseeability, certainty, and the connection between the plaintiff and the defendant—address the foreseeability of the relevant injury, while the other four—moral blame, preventing future harm, burden and availability of insurance—take into account public policy concerns that might support excluding certain kinds of plaintiffs or injuries from relief." (*Kesner*, *supra*, 1 Cal.5th at p. 1145.) In this personal injury context, whether Eisenhower owes a duty to persons coming into or out of its medical center "begins with the 'basic policy' that 'everyone is responsible for an injury caused to another by his want of ordinary care or skill in the management of his property,' and then considers whether more particular considerations of policy call for departure from the basic rule." (*Brown*, at p. 217; see also *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 398 ["[I]n cases involving traditionally compensable forms in injury—like physical harm to person or

property—we presume the defendant owed the plaintiff a duty of care and then ask whether the circumstances 'justify a departure' from that usual presumption"].)

Eisenhower in moving for summary judgment acknowledged that the existence of a duty of care is a question of law amenable to resolution by summary judgment. (*Regents of University of California v. Superior Court*, *supra*, 4 Cal.5th at p. 618; *Hassaine*, *supra*, 77 Cal.App.5th at p. 850.) It correctly pointed out that foreseeability of harm was a "crucial factor" in determining the existence and scope of a duty. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1189.) But Eisenhower argued below (and repeats on appeal): "[F]oreseeability does not by itself suffice to create a tort duty, because in hindsight, everything is foreseeable. [Citation.] Instead, the foreseeability must be 'reasonable.' The harm must be probable enough to charge the defendant with a duty to act. It includes events that in modern life are likely enough that reasonably thoughtful people would take account

of them in guiding their conduct."[7]  Eisenhower concluded:  "As applied here, the totality of the circumstances conclusively establish the utter lack of foreseeability.  Plaintiffs misused their [r]ollator product, plain and simple, and [Eisenhower] had nothing to do with it.  In fact, regardless of whether plaintiffs knew of the [product] warning or the warning was adequate, [Eisenhower] was not involved.  Plaintiffs' decision to use the [r]ollator in an unintended fashion did not create a duty on the part of [Eisenhower]."

This analysis, as plaintiffs point out, misperceives the proper inquiry. The question is not whether plaintiffs' conduct or misconduct created a duty of care on Eisenhower's part, but whether the *Rowland* factors warrant an *exception* to Eisenhower's general duty of care to maintain its property in a

_____

[7]     For these propositions, Eisenhower cited *Hegyes* v. *Unjian Enterprises, Inc.* (1991) 234 Cal.App.3d 1103, 1133 and *McGarry* v. *Sax* (2008) 158 Cal.App.4th 983, 997-998.  As will be evident from our discussion below, these cases do not assist it.  In *Hegyes*, the question was whether a negligent driver injuring a woman in a car accident owed a "preconception" duty of care to the child of the woman conceived years later.  (*Hegyes*, at pp. 1108-1109.) Holding no duty was owed because no " 'special relationship' " existed between the motorists (*id.* at pp. 1119, 1133), the Court of Appeal emphasized that while foreseeability is the "prime element by which courts are guided" in determining to whom a legal duty is owed, "the existence of a legal duty is not to be bottomed on the factor of foreseeability alone."  (*Id.* at p. 1131.) *McGarry v. Sax* explained that the use of special relationships to create duties has been "largely eclipsed by the more modern use of balancing [the *Rowland*] policy factors."  (*McGarry v. Sax*, at p. 996.)  With regard to foreseeability, *McGarry*, citing *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, further explained "[i]t is the *general character* of the event that is required to be foreseeable."  (*McGarry,* at p. 997; *Bigbee*, at pp. 57-58 ["it is settled that what is required to be foreseeable is the general character of the event or harm . . . *not its precise nature or manner of occurrence*" (italics added)].)  In any event, the existence of a duty is determined on a case-by-case basis.  (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472; *Elsheref v. Applied Materials, Inc.* (2014) 223 Cal.App.4th 451, 459.)

15

reasonably safe condition, which, on appeal, Eisenhower concedes it owes to the public.  Eisenhower did not undertake this analysis.  It did not engage in a "comprehensive look at . . . ' " sum total" ' of the [*Rowland*] policy considerations at play . . . ."  (*Southern California Gas Leak Cases*, *supra*, 7 Cal.5th at p. 399.)  While Eisenhower purported to assess foreseeability to argue it did not owe a duty as a matter of law, it did not consider the policy factors going to that issue, or any of the other public policy factors.  (*Kesner*, *supra*, 1 Cal.5th at p. 1145.)

Further, in arguing it owed no duty, Eisenhower improperly focused on the factual details of the particular incident.  An "important feature" of the *Rowland* analysis is that the factors "are evaluated at a relatively broad level of factual generality."  (*Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at p. 772; *Hassaine*, *supra*, 77 Cal.App.5th at p. 852.)  "[T]he court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .' "  (*Cabral*, at p. 772.)  Exceptions to the general duty of care may be made "only when foreseeability and policy considerations justify a *categorical* no-duty rule" (*ibid.*, italics added); this "preserve[s] the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not reach the duty of ordinary care, which in a jury trial is for the *jury* to make."  (*Ibid.*)  Thus, on duty, "California law looks to the entire 'category of negligent conduct,' not to particular parties in a narrowly defined set of circumstances.  [Citations.]  To base a duty ruling on the detailed facts of a case risks usurping the jury's

proper function of deciding what reasonable prudence dictates under those particular circumstances." (*Id*. at p. 774.)[8]

Because Eisenhower did not assess whether a categorical exception should apply to relieve it of its general duty of ordinary care to those coming on its premises, its motion failed to " 'negate theories of [its] liability' " (*Hedayati v. Interinsurance Exchange of the Automobile Club*, *supra*, 67 Cal.App.5th at p. 846) with respect to the duty element of plaintiffs' cause of action. As a result, Eisenhower did not meet its threshold burden to establish it owed plaintiffs no duty as a matter of law, and we end our

_____

[8] In *Cabral v. Ralphs Grocery Co.*, a truck driver stopped his tractor-trailer rig alongside an interstate highway in an area designated for emergency parking so he could eat. (*Cabral*, *supra*, 51 Cal.4th at pp. 768-769.) The decedent, Adelelmo Cabral, who was traveling on the freeway in his vehicle at 70 to 80 miles per hour, abruptly swerved off the freeway and crashed into the rear of the trailer. (*Id*. at p. 769.) Cabral's widow sued defendants, alleging the truck driver's negligence in stopping for nonemergency reasons on the freeway shoulder caused her husband's death. (*Id*. at p. 770.) In discussing whether the defendants owed a duty of care, the California Supreme Court emphasized "the factual details of the accident are not of central importance." (*Id*. at p. 774.) "That [the tractor-trailer driver] parked 16 feet from the outermost traffic lane, rather than six feet or 26 feet; that parking for emergencies was permitted in the dirt area he chose; that . . . Cabral likely left the highway because he fell asleep or because of some unknown adverse health event, rather than from distraction or even intoxication—none of these are critical to whether [the tractor-trailer driver] owed Cabral a duty of ordinary care. These facts may have been important to the jury's determinations of negligence, causation and comparative fault, but on duty California law looks to the entire 'category of negligent conduct,' not to particular parties in a narrowly defined set of circumstances." (*Ibid*.) The court framed the duty issue as "whether a freeway driver owes other drivers a duty of ordinary care in choosing whether, where and how to stop on the side of the road" or "whether a categorical exception to [the general rule that persons should take ordinary care] should be made exempting drivers from potential liability to other freeway users for stopping alongside a freeway." (*Ibid*.)

analysis without assessing plaintiffs' showing. (Accord, *ibid.*; *Mireskandari v. Edwards Wildman Palmer LLP*, *supra*, 77 Cal.App.5th at pp. 256-257.)

Eisenhower's additional appellate arguments are unavailing. It maintains that "this general duty" or the "type of foreseeability" raised by plaintiffs was not at issue in its summary judgment motion. It argues the foreseeability it raised in its motion "concerns *Appellants'* conduct and the risk *they* created by their own conduct in misusing the walker." Eisenhower argues "the question is not whether an elderly/infirm pedestrian walking on [Eisenhower's] premises is foreseeable. Instead, the question is whether [Eisenhower] should have anticipated that someone with . . . 'mobility impairments,' would ignore warning and misuse his/her device while on [Eisenhower's] premises, and in the process turning [*sic*] an otherwise non-negligent area into something unsafe." Citing *Edwards v. California Sports, Inc.* (1988) 206 Cal.App.3d 1284 without discussing it, Eisenhower says plaintiffs' conduct "cannot *create* a duty"; it argues it "did not have a duty to protect [plaintiffs] from their unforeseeable decision to misuse their walker as a wheelchair." It also says the area "only became hazardous when [plaintiffs] decided to operate their walker as a wheelchair in contravention to manufacturer warnings" and that "[a]ppellants created the dangerous condition, not [Eisenhower]."

These arguments still incorrectly frame the question in terms of the detailed facts of the incident, rather than the general character of the parties' conduct. Under *Cabral* (see footnote 8, *ante*), "[t]hese facts may [be] important to the jury's determinations of negligence, causation and comparative fault, but on duty California law looks to the entire 'category of negligent conduct,' not to particular parties in a narrowly defined set of circumstances." (*Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at p. 774).

*Edwards v. California Sports, Inc.*, does not compel a different conclusion. The plaintiff in *Edwards* was an intoxicated spectator who climbed a 50-inch high guard fence at a sports arena, then fell and sustained severe head injuries. (*Edwards v. California Sports, Inc.*, *supra*, 206 Cal.App.3d at pp. 1286, 1288.) The Court of Appeal reversed a judgment on a jury's verdict, concluding it "lack[ed] . . . any evidence to establish that defendant breached *any duty of care* in construction of the fence." (*Id*. at p. 1287, italics added.; see also *id*. at p. 1289 [jury's verdict was "based on the breach of a duty which, as a matter of law, did not exist"].) The court explained that the "fundamental inquiry is whether the duty of a landowner to exercise reasonable care in preventing injury to persons on the premises . . . required [preventative] measures" and more specifically in that case, whether the "defendant's duty of due care require[d] it to design and construct its building in a manner that would thwart plaintiff's derring-do[.]" (*Id*. at pp. 1287, 1288.) The court based its holding in part on policy considerations, observing the "fence was clearly adequate for its designed purpose" and there was a limit as to how far society should go through government regulation or the tort system "to protect individuals from their own stupidity, carelessness, daring or self-destructive impulses." (*Id*. at p. 1288.) Thus, the Court of Appeal held the defendant had no duty to construct the fence to prevent the plaintiff's misconduct. (*Ibid*.)[9] The *Edwards* court factored social policy into the analysis, as it must. (*Parsons v. Crown Disposal Co.*, *supra*, 15 Cal.4th at p. 476 [" 'social policy must at some point intervene to delimit liability' even for foreseeable injury"].) But as we have

---

[9]    To the extent foreseeability was part of the *Edwards*'s court's analysis. we observe that foreseeability for purposes of duty is different from foreseeability "in the fact-specific sense in which we allow juries to consider [the] question." (*Parsons v. Crown Disposal Co.*, *supra*, 15 Cal.4th at p. 476.)

19

explained, Eisenhower did not undertake the *Rowland* analysis, and thus did not meet its initial summary judgment burden on the question of duty.

C.  *Breach*

We reach the same conclusion as to Eisenhower's summary judgment showing as to breach.  Again, to meet its initial burden, Eisenhower was required to present evidence that *conclusively* negated the breach element of plaintiffs' cause of action.  (*Taylor v. Financial Casualty & Surety, Inc.*, *supra*, 67 Cal.App.5th at p. 979.)  On this point, Eisenhower argued, based on its expert Iler's declaration, that "[t]he existence of the joint cover was necessary and proper and conformed to the applicable standards and guidelines.  Further, by having beveled edges, the joint cover *exceeded* what the law required.  Consequently, using the 'reasonable person' standard, [Eisenhower's] conduct conformed to the applicable standard of care.  The incident simply could not have been reasonably foreseen by [Eisenhower]."  Eisenhower repeats these arguments on appeal, adding that the trial court properly sustained objections to plaintiffs' expert's declaration.

Iler's statement that the "location of the incident was constructed within applicable building and accessibility requirements and codes" and that the "joint cover conforms to local, state and ADA requirements relative to the use of wheelchairs and other mobility devices" is relevant to show Eisenhower exercised due care, but it is not "dispositive" where other factors require a higher degree of care.  (See *Lawrence v. La Jolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 31 [defendant property owner's compliance with a law or a safety regulation is relevant to whether a defendant acted with due care, but such compliance will not be dispositive " 'if there are other circumstances requiring a higher degree of care' "]; accord, *Nevis v. Pacific Gas & Elec. Co.* (1954) 43 Cal.2d 626, 630 ["Compliance with

20

the general orders of the Public Utilities Commission does not establish as a matter of law due care by the power company, but merely relieves it 'of the charge of negligence *per se*. It does not affect the question of negligence due to the acts or omissions of the company as related to the particular circumstances of the case' "]; *Howard v Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 421; *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 901 [finding "no merit" to the defendant's summary judgment argument that the fact a window out of which a child fell "met all applicable fire, building and safety codes establishes due care as a matter of law"]; *Perrine v. Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 448 ["even though P.G.&E. complied with all applicable governmental safety regulations, this would not serve to absolve it from a charge of negligence, but just negligence *per se*, for one may act in strict conformity with the terms of such enactments and yet not exercise the amount of care which is required under the circumstances"].) In the context of using a statutory standard of conduct to establish no breach of duty, the California Supreme Court explains: "Courts have generally not looked with favor upon the use of statutory compliance as a defense to tort liability. The Restatement Second of Torts summarizes the prevailing view in these terms: 'Where a statute, ordinance or regulation is found to define a standard of conduct for the purposes of negligence actions, . . . the standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them.' [Citations.] [¶] But there is some room in tort law for a defense of statutory compliance. Where the evidence shows no unusual circumstances, but only the ordinary situation

21

contemplated by the statute or administrative rule, then 'the minimum standard prescribed by the legislation or regulation may be accepted by the triers of fact, or by the court as a matter of law, as sufficient for the occasion . . . .' " (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 548; see also *Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1087.)

Here, plaintiffs assert that "by virtue of being a hospital, individuals using canes, walkers, wheelchairs, or relying on prostheses, or other medical devices significantly impeding their movement, are not only to be expected, but are specifically the kinds of individuals who are expected and invited to be at [Eisenhower's] facilities." They argue: "Hospitals, which exist to provide services to individuals who are sick and infirm, including those with mobile impairments, are subject to a standard of care beyond those prescribed by the ADA" and thus "the fact that the [e]xpansion [g]ap [p]late complied with the ADA does not resolve as a matter of law whether [Eisenhower] complied with the standard of care." They maintain a "reasonable juror could readily conclude that a reasonable owner or possessor of a hospital would have taken additional precautions beyond those standards codified under the ADA," which "establishes only a statutory minimum."

We are persuaded that in this medical center setting, where patrons can be infirm or have ambulatory impairments and others commonly use wheelchairs, walkers, canes and other walking assist devices like Gray's, Iler's declaration is insufficient to meet Eisenhower's initial burden to negate the breach element of plaintiffs' cause of action. Eisenhower argues under a reasonable person standard that its conduct *exceeded* the standard of care, on the basis that the joint cover had beveled edges. But Eisenhower's expert in his declaration did not specify that the plate cover had beveled edges, nor did

22

he aver the plate cover exceeded applicable standards; he stated that the cover was *within* applicable standards for both beveled and non-beveled vertical edges.  In short, because Eisenhower's evidence does not conclusively negate the element of breach, the trial court improperly granted summary judgment in its favor.

III. *Avrit's Declaration as to His Measurements and Whether the Plate Met ADA or Building Standards Code Requirements Raises a Triable Issue of Material Fact as to Breach in Any Event*

Even if we were to hold otherwise, that is, that Eisenhower demonstrated its compliance with ADA or building standards code met the standard of care as a matter of law so as to conclusively negate the element of breach, we would nevertheless reverse in view of Avrit's declaration.

While the formulation of the standard of care is a question of law for the court, the question of breach is a question of fact for the jury "if reasonable minds might differ as to whether the defendant's conduct has conformed to the standard." (*Ramirez v. Plough, Inc.*, *supra*, 6 Cal.4th at p. 546.)  On the issue of compliance with the relevant standards, Avrit's conclusions differed from Iler's, and summary judgment cannot be granted if it involves "choosing between competing expert opinions." (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 186.)

Avrit stated without objection from Eisenhower that in August 2021, he "inspected the subject area where [Gray] fell taking relevant photographs and measurements . . . ."  He stated it was his understanding that the "subject area" was in a substantially similar condition at the time of his inspection as it was at the time of the incident.  Avrit went on to describe the measurements he and his staff had taken (see fn. 5, *ante*), explaining "[t]he slope was measured by placing a digital level flush with the sloped leading

23

edge of the metal cover" and that the measurements he personally took were "consistent with the measurements taken by [his staff members] in June, 2018 and . . . December, 2019." He went on to aver: "Based on the measurements taken on each of [his company's] inspections, the subject height differential between the metal threshold and concrete walkway was a violation of the ADA and the California Building Standards Code at the time of the incident. The beveled change in level in the threshold exceeded the 1:2 (50.0 [percent]) requirement and instead measured a max of 61.7 [percent]." (Italics omitted.)

The trial court sustained Eisenhower's objections to Avrit's recitation of the results of his inspection and measurements (the third sentence of paragraph No. 12 of Avrit's declaration), as well as his conclusion that the height differential violated the ADA and California Building Standards Code. We conclude the evidentiary rulings were improper, whether we review them de novo or assess them for abuse of discretion.[10]

Eisenhower's first objection was that Avrit's statement of the measurement he took in August 2021 was irrelevant on grounds (1) the inspection was not permitted or authorized and Eisenhower did not know about it; (2) Avrit "fail[ed] to state that he took measurements in the area where the incident occurred," and as a result, (3) "there is no foundation for his opinion the vertical measurement in that area exceeded 1/4 [inch]."

_____

[10] The standard of review for assessing the court's evidentiary rulings in the summary judgment context is not settled, though the weight of authority applies an abuse of discretion standard. (See *Reid v. Google, Inc.*, *supra*, 50 Cal.4th at p. 535 ["[W]e need not decide generally whether a trial court's ruling on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo"]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226 [acknowledging *Reid* but holding the standard of review varies depending on the type of evidentiary objection].)

Eisenhower further objected that Avrit's declaration on these points violated Evidence Code sections 801 and 802, and lacked foundation in that he "fail[ed] to lay the foundation the testing technique and method he utilized to measure the slope of the beveled edge of the expansion joint cover was acceptable," nor did he "lay the required foundation that the device he utilized to measure the slope of the beveled edge of the expansion joint cover was properly calibrated" or "that the numbers displayed on his device in fact correlate to the measurement of the angle of the slope of the beveled edge of the expansion joint cover."

Opposing declarations on summary judgment, including expert declarations, must be liberally construed. (*Alexander v. Scripps Memorial Hospital La Jolla*, *supra*, 23 Cal.App.5th at p. 225; *Garrett v. Howmedica Osteonics Corp.*, *supra*, 214 Cal.App.4th at p. 189.) Courts must be cautious about excluding expert testimony. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772.) " 'The goal of trial court gatekeeping is simply to exclude "clearly invalid and unreliable" expert opinion. [Citation.] In short, the gatekeeper's role "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." ' " (*Garrett*, at p. 187.) In the summary judgment context, the rule of liberal construction means "a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." (*Id.* at p. 189.)

None of Eisenhower's grounds justified excluding these portions of Avrit's declaration, liberally construing it as we must. Though Eisenhower

25

complains it was unaware of Avrit's inspection of its premises, Eisenhower cites no California authority for the proposition that those circumstances warrant exclusion of the evidence.[11]  To the contrary, the availability of discovery does not preclude an independent investigation of a place that is open to the public.  (See *Pullin v. Superior Court* (2000) 81 Cal.App.4th 1161, 1165 ["[P]roperty open to the public can be examined without recourse to [Code of Civil Procedure] section 2031 . . . provided that the examination can be conducted in a lawful fashion"].)

Further, Avrit's statement in the unchallenged portion of his declaration that he "inspected *the subject area where* [*Gray*] *fell taking relevant photographs and measurements*" (italics added), liberally construed, permits an inference that his measurements were taken in the location where the accident occurred.  While the record contains some photographs appearing to show Avrit measuring in an area some feet away from Eisenhower's entrance, Eisenhower acknowledges there are other photographs; it does not establish these images are not from the medical center entrance.

We are unpersuaded that the court properly sustained Eisenhower's objections about the absence of foundation or detail to demonstrate "acceptable" testing techniques and methods, Avrit's "proper[ ]" calibration of

_____

11     Eisenhower cites a case in which a federal district court judge ruled Avrit's opinions inadmissible because they were based on an unauthorized inspection.  But the court's ruling was based on the Federal Rules of Civil Procedure, rule 34(a)(2), and (b).  (*Nakamura v. Lowe's Companies, Inc.* (C.D.Cal., Aug. 19, 2015, No. 2:14-cv-9574-ODW(ASx)) 2015 WL 4945722, at *3.)  It does not persuade us to change our conclusion.  Eisenhower also complains that plaintiffs denied in discovery responses that an inspection by one of Avrit's staff members ever took place, and that plaintiffs should be "estopped" from using the materials from that inspection.  It cites no authority for that proposition, however,

26

the measuring device, or the correlation of the device's numbers with the joint cover's slope. Avrit stated he measured the slope "by placing a digital level flush with the sloped leading edge of the metal cover" and his photographs additionally show his use of a metal ruler. At the summary judgment stage, "[t]hose imperfections do not make [Avrit's] sources so unreliable or speculative as to lead to rejection. So long as foundational reliability is met, the strength of an expert's assumptions affects the weight rather than the admissibility of the opinion." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1121.)

These claimed deficiencies are akin to the claims rejected in *Garrett v. Howmedica Osteonics Corp.*, *supra*, 214 Cal.App.4th 173. In *Garrett*, a products liability action against the supplier of a prosthetic bone, the defendant in a summary judgment context argued the plaintiff's opposing expert declaration was inadmissible for lacking a reasoned analysis because the expert did not describe the testing methods used to reach his conclusion. (*Id.* at 185.) The Court of Appeal, reviewing the requirements of Evidence Code sections 801 and 802, concluded the absence of more specific information on the expert's testing methods did not justify the exclusion of his conclusions on grounds they were speculative, conjectural, or lacked a reasonable basis. (*Garrett, supra,* at pp. 186-189.) *Garrett* explained that "[i]n light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." (*Id.* at pp.

27

183, 189.)[12] As in *Garrett,* we conclude the trial court failed to liberally construe Avrit's opposing summary judgment declaration. Avrit described his testing methods and their results. His recitation of the measurements he

[12] The expert in *Garrett*, Lawrence Kashar, declared that he " 'conducted extensive examinations of the portions of the prosthetic device that were removed from Mr. Garrett using visual examination, optical microscopic examination, X-ray radiography, fluorescent dye penetrant examination, scanning electron microscopy, and such destructive testing as hardness testing, micro hardness testing, microstructural analysis, and chemical analysis.' " (*Garrett v. Howmedica Osteonics Corp.*, *supra*, 214 Cal.App.4th at p. 187.) "He declared that he had determined, based on his examinations, that the fractured portion of the prosthesis was softer than the 'minimum required hardness' in two of the three ASTM [American Society for Testing and Materials] specifications covering the alloy for use in an implant and was less than the 'expected hardness' of the third specification." (*Ibid*.) The Court of Appeal found the explanation sufficient to support his opposing summary judgment opinion: "In our view, Kashar's failure to describe the particular testing processes that he used to arrive at his conclusions regarding the hardness of the prosthesis and his failure to more particularly describe the results of that testing do not in any manner indicate that his conclusions are speculative, conjectural or lack a reasonable basis." (*Ibid*.) It reached the same conclusion with regard to the expert's failure to identify the particular ASTM specifications he considered, stating the "absence of that information does not render the declaration conclusory and cannot justify the conclusion that there was no reasonable basis for Kashar's opinion. Moreover, Kashar's failure to expressly state that the prosthesis should have complied with the ASTM specifications for Cobalt—28 [percent] Chromium—6 [percent] Molybdenum alloy and his failure to expressly state that the purported defect was a cause of the device's failure are immaterial because those matters are readily inferable from the facts and opinion expressly stated." (*Id*. at p. 188.) Here, Avrit's analysis in this case was not nearly as complex, as it involved measuring the height difference between the walking surface and the edge of the metal plate with a digital level and ruler. The requirements of Evidence Code sections 801 and 802 provided no basis to exclude the objected-to statements and conclusions on the question of breach.

28

took and whether they complied with the ADA or California Building Standards Code should not have been omitted or deemed insufficient at the summary judgment stage. To adopt language in *Garrett, supra,* 214 Cal.App.4th 173, "[w]hatever shortcomings . . . cross-examination may or may not reveal in [Avrit's] testing methods and opinion, we believe that the absence of more specific information as to the . . . methods used and the results obtained would not provide any grounds for the trial court to conclude that there was *no* reasonable basis for [his] opinion." (*Id.* at p. 187.)

DISPOSITION

The judgment is reversed. Plaintiffs are to recover costs on appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.