Filed 7/30/25  P. v. Lamar CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER JAY LAMAR,<br><br>    Defendant and Appellant. | D086177<br><br><br><br>(Super. Ct. No. FWV22003765) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael Knish, Judge.  Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christopher Jay Lamar of seven counts related to the robbery of a jewelry store:  two counts of robbery (Pen. Code, § 211[1]), three counts of assault with a semiautomatic firearm (§ 245, subd. (b)), and two

---

[1]    Further undesignated statutory references are to the Penal Code.

counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found true allegations that Lamar personally used a firearm during the commission of the robberies and assaults (§§ 12022.5, subds. (a), (d), 12022.53, subd. (b), 1192.7, subd. (c), 667.5, subd. (c)) and was personally armed while unlawfully possessing a firearm (§ 12022, subd. (a)(1)). The court sentenced Lamar to an aggregate prison term of 50 years to life, plus seven years four months. Lamar timely appealed.

Lamar asserts the court prejudicially erred by allowing the investigating detective to testify as an expert about cell phone call detail records. The People contend the detective had sufficient qualifications to testify as an expert on the subject, and, alternatively, any error in the admission of her testimony was harmless.

We conclude the trial court did not prejudicially err in admitting the testimony. We, therefore, affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Robbery*

On October 15, 2022, two men entered a jewelry store wearing black clothing and masks and said, "This is an assault." One of the men wore a "uniform" jacket and carried a gun. The store owner told the men law enforcement was coming and activated an alarm. The man wearing the uniform jacket ran to her and said, "Hell no." He put his gun to her head, and then he hit her twice on the head with the weapon. The man took gold, jewelry, and two cell phones from the owner's desk and asked, "Where is the cash, Bitch?" The other man broke display cases. The suspects also pointed their guns at a man shopping in the store and ordered him to the ground. The suspects stole over $20,000 worth of merchandise.

Around the time of the robbery, a witness driving in the shopping center parking lot saw a car speed up to her, almost hitting her. The witness

2

then saw two men in masks run out of the jewelry store and get into the car. She took a picture of the car's license plate and provided the information to investigating officers.

## II. *Recovery of the Suspect Vehicle and the Cell Phones*

On the evening of the robbery, a deputy sheriff located the suspect vehicle parked near some train tracks. The vehicle was a silver Toyota Camry registered to Angel Olvera.

A couple of days later, the store owner's daughter found the owner's stolen cell phones near the same train tracks, less than 1,400 feet from where police located the Camry.

## III. *Lamar's Arrest*

On October 19, 2022, investigating officers learned Lamar was suspected in the robbery, and he was at a mall. They located Lamar inside the mall, walking with David Goffney and another individual. The officers approached Lamar when he returned to his vehicle. Lamar fled on foot. After a short chase, the officers apprehended Lamar in the mall parking lot. Lamar admitted to having a loaded gun in his backpack. In the backpack, officers found a black and tan, nonserialized gun.

## IV. *Angel Olvera's Statements and Testimony*

After locating and towing Olvera's Camry, the officers notified him he could pick up his vehicle at the sheriff's station. When Olvera appeared at the station, a detective questioned him about the jewelry store robbery.

Olvera told the detective he let Lamar take his Camry after Lamar offered to buy it. The next day, the day of the robbery, Lamar and Goffney picked Olvera up in the Camry; Goffney was driving. When Olvera got in the back of the car, Lamar took Olvera's cell phone, turned the phone off, and told Olvera they had to go do something. Eventually, Lamar told Olvera they were going to rob the jewelry store.

3

Before entering the store, Lamar put on a security jacket, and Olvera put on a sweatshirt, an Amazon delivery shirt, black pants, gloves, and a ski mask that Lamar gave him. Lamar also gave him a black gun. Lamar had a "brown" gun. Goffney then dropped Lamar and Olvera off, and they entered the jewelry store.

Inside the store, Olvera saw Lamar hit the store owner. Olvera broke a display case, took a pearl necklace, and left the store. He later gave the necklace to Lamar and Goffney.

After the robbery, the men parked the Camry and drove away in a Lexus.

Olvera was charged for his participation in the robbery, and he entered into a plea agreement. Pursuant to the agreement, he pleaded guilty to one count of second degree robbery and one count of assault with a semiautomatic firearm, with firearm enhancements and the admission of one strike prior. He agreed to testify truthfully against Lamar.[2]

Olvera's testimony at Lamar's trial was largely consistent with his statements to the investigating officers, but with some additional details. Specifically, at trial, Olvera testified Lamar used a black and tan gun during the robbery, and Lamar threw the store owner's cell phones out of the car near the train tracks. Olvera also admitted he lied to the detective about some details to mitigate his involvement in the crime. For example, he told the detective Lamar pointed a gun at him when they drove to the jewelry store even though that never happened.

V. *Other Evidence*

---

[2] Before Lamar's trial, Goffney pleaded guilty to one count of robbery in violation of section 211 for his participation in the robbery.

Officers discovered photos of jewelry on Goffney's cell phone, which were taken shortly after the robbery. The store owner identified the jewelry in the photos as items stolen from her store during the robbery.

In addition, surveillance video from the shopping center where the robbery took place showed a silver or tan Camry apparently casing the area on the morning of the robbery. The video also showed two suspects exit the Camry at the time of the robbery and then later run back to the vehicle. Surveillance video from inside the store showed one suspect wearing an Amazon vest and the other suspect holding a black and tan gun.

A fingerprint examiner matched Lamar's fingerprint to a print found on the rear driver's side door of Olvera's Camry. A forensic biologist matched Lamar's and Goffney's DNA to items found inside the Camry.

VI. *Call Detail Records*

A. Detective's Testimony

During trial, the investigating detective testified the term "Call Detail Records" refers to "a log of phone calls and text messages on a person's cell phone account." She explained call detail records reflected the date and time cell phone activity transpired, the duration of the activity, whether a call was incoming or outgoing, and the number called or texted. When asked to explain for the jury what a cell service tower was, the detective testified, "We're able to make phone calls because of the service towers around a particular area." She explained the call detail records allowed her to determine what tower was used for a particular transaction, and thus, estimate a rough location of the subject cell phone at the time of a call or text.

The detective then identified for the jury the call detail records associated with Lamar's cell phone. Based on the call records, Lamar's cell phone had call activity that connected through the tower "a couple hundred feet from . . ." the jewelry store the day before the robbery. About 40 minutes

5

after the first call, Lamar's cell phone had call activity that connected through a tower near the area where law enforcement located Olvera's Camry and the store owner's cell phones. Throughout that day, there were multiple calls between Lamar's cell phone and Olvera's cell phone. The detective explained the significance of the call history on the day before the robbery by testifying it is common for people to "research" or "case" target areas before committing a crime.

According to the detective's testimony, the call records further showed that, on the day of the robbery, a call was placed between Lamar's cell phone and Olvera's cell phone at 12:08 p.m. Lamar's cell phone reflected another call at 12:11 p.m., after which the phone had no activity until 3:14 p.m., when Lamar's cell phone called Goffney's cell phone. The robbery occurred around 2:38 p.m.

The detective similarly testified with respect to the call detail records associated with Olvera's cell phone. Olvera's cell phone showed no activity between 2:01 p.m. and 2:47 p.m. on the day of the robbery. At 3:15 p.m. and 3:40 p.m., there were two calls placed between Olvera's cell phone and Goffney's cell phone.

During cross-examination, the detective testified she received informal training on call detail records and how to read them, and she had a "general understanding of how cell towers work." Lamar's trial counsel moved to strike all of the detective's testimony about cell towers as being outside of her personal knowledge; the trial court reserved ruling. The detective then admitted that, when placing a call, a cell phone does not necessarily connect through the nearest tower. Hypothetically, a cell phone could connect through a tower "a couple of miles" away. Lamar's cell phone could have been 15 miles or more away from the tower near the jewelry store when the tower registered the call activity on the day before the robbery. The detective

6

qualified her testimony by explaining she was "not an expert" with respect to determining the distance between a cell phone and a tower, which prompted defense counsel to again move to strike her testimony. The trial court again deferred ruling.

B. Evidence Code Section 402 Hearing and Ruling

After the close of evidence, the trial court conducted a hearing outside the presence of the jury on the motion to strike the detective's testimony under Evidence Code section 402. Lamar's defense counsel argued the detective lacked sufficient scientific understanding of the data in the call detail records to render an opinion regarding the location of a cell phone in relation to a tower, and that her testimony was irrelevant.

The detective testified at the hearing that she had no engineering training and never worked for a telecommunications company. She never had a job involving work on cell towers, never attended trainings on how cell towers work, and never had anybody explain to her the process of how a cell signal connects to a tower.

The detective testified, however, she had conducted approximately 100 investigations involving call detail records. Before she became experienced with call detail records, several senior officers explained how to read the data contained in the records. Despite her knowledge of call detail records, she was "unclear on the precise location somebody is when a cell phone is connected to a tower." Although she knew a cell phone connects to the nearest available tower, she was unable to determine whether the cell phone was "five feet, 15 feet, 25 feet" from the tower when the activity was recorded. She believed other people might be able to determine the distance with more scientific accuracy.

The trial court ultimately denied the motion to strike the detective's testimony. The court concluded the detective was "not a master expert" on

7

cell towers, but she met the "minimum standards" to testify as an expert on the subject. The court explained the detective's testimony was admissible "subject to the weight being decided by the jury."

## DISCUSSION

Lamar raises a single issue on appeal. He contends the trial court prejudicially erred by allowing the investigating detective to testify as an expert about call detail records related to the suspects' cell phones. Lamar contends the admission of the testimony denied him his federal constitutional right to due process and violated state evidentiary rules.[3] The People assert the detective had sufficient qualifications with respect to the call detail records to qualify as an expert. Alternatively, the People contend, if the court erred by allowing the expert testimony, the error was harmless. We find the trial court did not err by admitting the testimony, and regardless, any potential error was harmless under any standard.

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801, [subd. (b)]). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is

---

[3] Within his due process argument, Lamar also asserts the trial court violated his Sixth Amendment right to have a jury determine all facts related to his guilt. We do not expressly address this undeveloped contention. (*People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5 [court need not consider constitutional argument void of analysis or authority].) Nevertheless, for the same reasons discussed *post*, any Sixth Amendment violation here was harmless. (*People v. French* (2008) 43 Cal.4th 36, 52 [" 'Failure to submit a sentencing factor to the jury, like failure to submit an element [of the crime] to the jury, is not structural error[,]' " and thus, is subject to harmless error review]; but see *People v. Ernst* (1994) 8 Cal.4th 441, 449 [total denial of right to jury trial on charged offense is a structural defect].)

"sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) "[E]videntiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226.) We will not disturb the trial court's exercise of that discretion in determining an expert witness's qualification "absent a showing of manifest abuse" such as when " ' " 'the evidence shows that a witness *clearly lacks* qualification as an expert.' " ' " (*People v. Jones* (2012) 54 Cal.4th 1, 57 (*Jones*).)

The erroneous introduction of evidence against a defendant may violate due process where the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.' " (*Dowling v. United States* (1990) 493 U.S. 342, 352.) "For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been ' "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." ' " (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025–1026.)

Under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), a federal constitutional error is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id.* at p. 24.) State law evidentiary errors are analyzed for harmless error under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Hin* (2025) 17 Cal.5th 401, 482.) "This requires us to examine whether it was 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Johnson* (2022) 12 Cal.5th 544, 611.)

9

Here, following the Evidence Code section 402 hearing, the trial court did not abuse its broad discretion or deny Lamar due process by admitting the detective's testimony after carefully considering her qualifications, including her training and experience. The court concluded she had the minimum qualifications to testify about the call detail records. The court properly left the weight of her testimony to the jury. (*Jones, supra*, 54 Cal.4th at p. 59 ["Once an expert witness establishes knowledge of a subject sufficient to permit his or her opinion to be considered by a jury, the question of the degree of the witness's knowledge goes to the weight of the evidence and not its admissibility."].) Nevertheless, any potential error was harmless under either standard.

Lamar contends the admission of the detective's testimony about the call detail records was prejudicial because the cell phone evidence was the only thing corroborating Olvera's statements implicating Lamar. We disagree. Setting aside the detective's testimony, substantial evidence corroborated Olvera's account that he, Lamar, and Goffney committed the robbery using Olvera's Camry. A vehicle matching Olvera's Camry was seen in surveillance video near the jewelry store before the crime. Video also showed the suspects wearing the clothing Olvera described. The witness in the parking lot saw the suspects run away from the jewelry store and get into Olvera's Camry, and the surveillance video confirmed her account. Forensic evidence placed both Lamar and Goffney inside the Camry. Lastly, Lamar's associate, Goffney, had photos of the stolen jewelry on his cell phone.

Lamar further asserts that, absent the cell phone testimony to corroborate Olvera's identification of Lamar as one of the robbers, the remaining evidence implicated Goffney as the person who robbed the store with Olvera. But ample evidence apart from the cell phone data supports the conclusion Lamar was in the store. The store owner described the suspect

with the uniform jacket as "tall" and "skinny." Lamar was described at trial as taller and skinnier than Goffney. In addition, surveillance video established the suspect who entered the store with Olvera used a gun with a distinct black and tan color pattern. Lamar was arrested while in possession of a matching gun. Lamar did not present any evidence to dispute Olvera's claim that Goffney was wearing a white T-shirt on the day of the robbery, and surveillance video showed the driver of the Camry wearing "[a] very light color or white" shirt. On the other hand, surveillance video showed the passenger of the Camry had a yellow shield on the chest area of his clothing, which was consistent with the suspect who wore the security jacket inside the jewelry store.

On this record, we agree with the People that it is "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra*, 386 U.S. at p. 24.) It is also not reasonably probable that absent the cell tower testimony the jury would have acquitted Lamar. (See *Watson, supra*, 46 Cal.2d at p. 836.)

DISPOSITION

The judgment is affirmed.


                                                  McCONNELL, P. J.

WE CONCUR:



IRION, J.



CASTILLO, J.